McMANUS et al. v. DURANT et al. (No. 7579.)

(Supreme Court, Appellate Division, First Department. July 9, 1915.)

1. CORPORATIONS ⬅30—PROMOTERS—PROFITS—ACCOUNTING.

A promoter of a corporation owned 70 per cent. of the stock and had exclusive control over its business as director, manager, and president. Three minority stockholders owned the balance of the stock. The promoter financed the corporation for several years, and the minority stockholders had no knowledge that they could obtain more than par value for their stock on a sale. The promoter sold all the stock to a purchaser for $150 a share, of the par value of $100. The purchaser did not assume the obligations of the corporation, but they were taken over by the promoter, except in one instance, and he received in return the liquid assets of the corporation. Held, that the promoter sustained towards the minority stockholders a fiduciary relation, and owed to them the duty of full disclosure, and where he failed to do so he was liable to account to them for the profits realized by him on a sale of the stock; and this was true,

whether the transaction was viewed as a sale of the stock of the minority stockholders to the promoter individually and a resale by him, or a sale by the minority stockholders through the agency of the promoter to the purchaser.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 97–100; Dec. Dig. ☞30.]

2. CORPORATIONS ☞187—STOCKHOLDERS—COMMUNITY OF INTERESTS—OBLIGATION OF MAJORITY STOCKHOLDER.

A corporation holds its property in trust for its stockholders, and this community of interests imposes a community of duty and a mutuality of obligation to do nothing to impair the property or title of the corporation, and creates such a fiduciary relation as makes it inequitable for a majority stockholder, directing and controlling the corporation, to do anything to the detriment of minority stockholders, and he must pay over to them their just proportion of the income and proceeds of corporate property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 702, 703; Dec. Dig. ☞187.]

3. CORPORATIONS ☞187—SALE OF STOCK BY MAJORITY STOCKHOLDER—ACCOUNTING—WAIVER.

Minority stockholders, seeking to compel the majority stockholder to account for profits made by him on a sale of their stock, based on the theory of a failure of the majority stockholder to disclose the true nature of the transaction relied on, may stand on the sale; and they, by retaining the notes given them in payment of their stock and accepting the proceeds thereof, did not waive their right to compel an accounting.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 702, 703; Dec. Dig. ☞187.]

Ingraham, P. J., dissenting.

Appeal from Special Term, New York County.

Action by Francis P. McManus and others against Howard M. Durant and others. From a judgment dismissing the complaint after trial, plaintiffs appeal. Affirmed in part, and reversed in part, and directed in favor of plaintiffs for an accounting by defendant Durant.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Benjamin G. Paskus, of New York City, for appellants.

John Ewen, of New York City, for respondent Durant.

Graham Sumner, of New York City, for respondents William C. Sheldon & Co.

DOWLING, J. The controversy between the parties herein arises out of the affairs of a corporation known as the St. Gabriel Lumber Company, Limited, formed under letters patent of the province of Quebec, Canada, in September, 1902. Prior to the incorporation of said company, Lindley M. Garrison, one of the plaintiffs, who had met defendant Durant socially, had a conversation with the latter, in which Durant said that he had been interested from time to time largely in the matter of purchasing tracts of land containing timber, either for purchasers who had commissioned him so to do or as a broker, and, Garrison having clients who were largely interested in the purchase of timber lands and lumber, they concluded to interest themselves to-

gether; Durant undertaking to search in Canada for suitable timber land which could be purchased at an attractive price, and Garrison undertaking to look for persons desirous of investing therein, the intention being that in the event of a sale they should profit therefrom as brokers. Garrison at that time was a member of the firm of Garrison, McManus & Enright, attorneys, at Jersey City, N. J.; the other partners being Francis P. McManus, one of the plaintiffs in this suit, and John M. Enright.

In the spring of 1902 Garrison received word from Durant, who was then in Canada, that he was willing to become personally interested in a timber tract about which he had heard, and McManus was sent to Canada to look over the ground with Durant. He did this, and upon his return he and his partners, Garrison and Enright, concluded to go into the enterprise personally, and prepared a prospectus and arranged the preliminaries for the capitalization of the corporation, which was to have a capital stock of $200,000, of which but $133,000 was eventually issued, $108,000 whereof was paid for in cash, and the other $25,000 whereof was issued to Durant in payment for his services. Durant had paid $500 personally for a 30-day option on the tract in question, known as the "St. Gabriel proposition." About July 18, 1902, and before the organization of the new company, Garrison met Durant in New York and was informed by the latter that he had had a talk with George R. Sheldon, who was a director in the Union Bag & Paper Company, and that it was understood that that concern would make a contract with the new company by which the latter would realize a profit of $1 a cord for pulp wood, together with an advance which would cover the necessary working capital. Durant also said that he had been conferring with the Sovereign Bank of Canada for a mortgage of $100,000 on the entire plant, and that he had been trying to interest friends in Canada in the project. He also said that he personally would put up $50,000. Garrison then told him that he and his associates, Enright, McManus, and Mrs. Archer (sister of the last named), would put up $40,000.

On August 15, 1902, McManus returned to Canada, and a meeting was held in Montreal at which the details of the proposed corporation were settled. At this time Durant stated that the property previously investigated by himself and McManus (McManus, however, having no practical knowledge of the timber business), and on which Durant had obtained an option, could be obtained for about $200,000, $100,000 of which would be raised by a mortgage to the Sovereign Bank. Durant, with McManus' consent, had made arrangements with certain customers of the proposed corporation, who agreed to put in $15,000 temporarily, to work the plant; it being understood that this sum was to be returned to them later on and in the interim they were to have stock as security. An agreement was then drawn between the parties by which Durant was not to sell his stock without first giving Garrison and his associates the opportunity of purchasing it, while they made a similar agreement with Durant. Five directors were provided for, whereof Durant was to name two, the Sovereign Bank one, McManus and Garrison jointly one, and Durant and Mc-

Manus jointly one. Then, in September, 1902, a conference was held at the office of Wm. C. Sheldon & Co., in New York, where the further details of the organization were settled, and where it was arranged that Durant was to receive $25,000 in stock for his work in connection with the inception of the enterprise, together with a salary of $5,000 a year. McManus and his associates subscribed for $43,-000 of the stock of the company, whereof McManus contributed $23,-000, Garrison $6,500, Mrs. Archer $10,000, and Enright $3,500. Durant contributed $50,000 for stock.

After the incorporation of the company in September, 1902, the capital stock was distributed in the proportions indicated, and the property was bought for $195,000, whereof $100,000 was obtained on mortgage from the Sovereign Bank. The first directors of the company were W. Graham Brown, Howard M. Durant, Victor E. Mitchell, W. L. Moore, and Francis P. McManus. Durant was elected president of the company, Mitchell vice president, and Brown secretary and treasurer. About two years after the business began McManus became vice president. In 1906 certain difficulties arose between the St. Gabriel Company and the customers who had originally put the $15,000 into the business, as a result of which Durant purchased their stock from them. He gave McManus and his associates an opportunity to purchase part of this stock, but they refused to take it. In January, 1907, Enright sold his stock to Durant at 90, on the completion of which sale the holdings in the company were as follows: Durant, $93,500 (made up of his $50,000 originally invested, $25,000 voted to him for his services before the organization of the company, $15,000 bought from the customer corporations, and $3,500 bought from Enright); McManus, $23,000; Mrs. Archer, $10,000; and Garrison, $6,500. The company continued business, but what profits it made went into improvements, and it was obliged to borrow large sums of money.

During the first year the plaintiffs and Enright obtained the discount of a note for $10,000 for the accommodation of the company, but declined to join in any subsequent guaranties of loans made by the Sovereign Bank, and when the latter insisted upon such a guaranty Durant gave it personally. In 1907 the amount so owed and guaranteed amounted to about $200,000. Meantime, plaintiffs had been desirous of selling their stock, apparently commencing so to feel in January, 1904. In March, 1905, the Union Bag & Paper Company requested an option on all the stock of the company for a price of about $330,-000, on consideration that all liabilities would be paid, and that Durant should have the liquid or floating assets for that purpose. On March 8, 1905, plaintiffs and Enright gave an option on their stock to Durant at a fixed price of 115. This sale to the Bag Company never went through, though negotiations continued for some time thereafter. Although Enright's stock was bought by Durant in January, 1907, it had been offered to him as early as December, 1904, at the fixed price of $90 a share, and at this time he could also have purchased Garrison's stock at the same figure per share; but he declined to buy, saying that he thought Garrison should get more for it. Garrison himself tes-

tified that when he gave the option on his stock at 115 he told Durant that the latter was optimistic about the outlook; to go ahead, that he would take a fixed price for his stock, and, if any profit was made over and above that, Durant could take it and do with it as he pleased.

In 1907 the Sovereign Bank began pressing for the amount due it from the company, aggregating about $180,000, in addition to the $100,000 mortgage. It being difficult or impossible to obtain other credit, Durant resumed negotiations with the Union Bag & Paper Company in an endeavor to make a lease of the property to it, or a sale of half the stock, with an option on the balance, and made such an offer subject to the approval of the stock and bondholders. These negotiations ended, however, when the Sovereign Bank went into liquidation, which took place January 18, 1908. Durant wrote to McManus on January 20, 1908, advising him of the bank's failure, and telegraphed him to meet him in New York, at the Lotus Club, which he did on January 23d, when they had a conference over the financial situation. McManus suggested contesting foreclosure proceedings by the use of every legal delay possible, until better times financially arrived. Durant did not see much hope in this, but said that he had a line of action in mind, and that by reason of the relations between Sheldon and himself he thought he could find means of escaping the catastrophe which was facing them. At a later meeting Durant said that he was getting along with the matter, and hoped to make arrangements by which he could get notes of the Union Bag & Paper Company or some equally good company for the stock at par, and asked if McManus and his associates would accept such notes, to which McManus replied that he would take the responsibility of saying yes. McManus gives the date of this interview as February 14th. At that time McManus told Durant of an idea he had for interesting English capital in the company, but said that it was only a remote chance. McManus testified that at no time up to this date had Durant suggested he was receiving a different compensation from the other stockholders.

Shortly thereafter powers of attorney were prepared and delivered to McManus by Garrison and Mrs. Archer, and McManus claims that these papers were represented by Durant as having been drafted by Sheldon, although Sheldon denies that he had done so. Durant telegraphed to McManus to deliver the papers to Sheldon, which was done, at which time McManus claims that Sheldon said that he expected the entire matter would be closed shortly; that Durant had failed to appreciate in the beginning the amount of working capital that would be necessary; that he had had very little business experience, and that he (Sheldon) had loaned Durant the money to go into the enterprise, besides other moneys to a total of about $100,-000. Then, on April 13, 1908, at Sheldon's office, notes of the Union Bag & Paper Company to the order of McManus, Garrison, and Mrs. Archer, dated April 10, 1908, payable in one year, were delivered to McManus for the respective amounts of their stock holdings in the St. Gabriel Company at par. Note No. 1 was made out to McManus, for $10,000; note No. 2, to McManus, for $13,000; note

No. 3, to Garrison, for $6,500; and note No. 4, to Mrs. Archer for $10,000. These notes bore the following statement upon their face:

"This note is one of a series of 19 notes made by the Union Bag & Paper Company and numbered consecutively from 1 to 19 inclusive, aggregating $200,000 of principal, all of which are secured by a pledge of 1,330 fully paid shares of the capital stock of the St. Gabriel Lumber Company, Limited, of the par value of $100 each."

On receiving the notes McManus made some comment on this statement appearing on the face of the note, but no information was volunteered him respecting it, and he raised no further question in reference thereto. Garrison, however, after receiving his note, wrote to Sheldon for information, and for a copy of the instrument of pledge, in response to which Sheldon answered his questions, none of which had to do with the consideration for the sale of the stock, however. He also quoted a clause from the instrument of pledge. Garrison repeated his request for a copy of the instrument of pledge itself, which was finally sent him on April 21, 1908. This instrument of pledge recited the making of the 19 notes in question, and the pledge by the Union Bag & Paper Company of 1,330 shares of stock of the St. Gabriel Lumber Company, Limited, as security therefor, made to the National Trust Company, Limited, dated April 10, 1908. Six of these notes, numbered 5 to 10, inclusive, amounting to $72,063, were shown therein to be payable to Wm. C. Sheldon & Co., and the remaining 9 notes, amounting to $88,436, were payable to Howard M. Durant. Garrison wrote to Durant, asking for an explanation of the sale, but received no reply. On July 15, 1908, Durant answered a letter of June 10th from McManus, and also one of July 2d; the delay, he claimed, being due to his traveling. He would not answer McManus' questions as to the terms of the sale definitely, as he said it was not in his power to do so; but, even if it were, he failed to see how the matter concerned either him or Garrison:

"The transaction you allude to was a perfectly simple one, by which you and he sold your St. Gabriel Lumber Company stock at par, and this after both you and he had expressed a willingness to take less. You know very well that you were both very glad to get the price you did, especially so at the time and under the circumstances. I note that you state it was the understanding of yourself and Mr. Garrison that each stockholder was to receive identically the same amount for his stock. I can only say that neither of you ever had any such thing intimated by me, and, moreover, you yourself, in an interview with the writer at the Lotus Club previously to the passing of the options on the stock, openly said that you were not concerned in what became of stock other than your own. It seems to me, if you would turn your thoughts to what would have happened to your stock if it had not been for me, you would cease to be curious as to other details. I regret very much if my letter seems unsatisfactory and curt, but when I think that the stock belonging to yourself and your friends would practically have been forfeited more than once through foreclosure proceedings if I had not protected it along with my own, I must confess to not feeling very amiable. I may say in conclusion that you could not, so far as I can see, have received more for your stock than you did."

At an accidental meeting between Garrison and Durant in New York, Durant said that he had assumed a great deal of obligation in the matter and Sheldon had to have his "rake-off"; there was very

little left—something like 1 per cent. or 2 per cent. Garrison insisted that they were all entitled to a proportionate share of whatever had been realized upon the sale, which idea Durant repudiated absolutely. After McManus had delivered the certificates of stock and powers of attorney, he heard nothing more from Durant, and it was not until he visited Sheldon's office on April 10th that he learned the treasurer of the Bag & Paper Company had said that the deal had been closed; but he got no further word until he returned to Sheldon's office again on the 13th of that month, when he received the notes. At a meeting at the Lotus Club, Durant told McManus that he had made himself responsible for a lot of things, that he had been obliged to pay a commission to Sheldon, and that all that was left was 1 per cent. or 2 per cent. McManus in his testimony denied the statement in Durant's letter, heretofore quoted, as to what was said at the Lotus Club interview. It was not until an action was commenced in the New Jersey Court of Chancery for an accounting and to impress the purchase notes with a trust that the plaintiffs learned for the first time of the real terms upon which the sale to the Union Bag & Paper Company had taken place.

It then appeared, as now appears from this record as well, by the testimony of Edgar G. Barrett, now president of the Union Bag & Paper Company, and its vice president at the time of the consummation of the deal in question, that on March 7, 1908, the Union Bag & Paper Company made Durant a proposition to purchase the entire capital stock of the St. Gabriel Lumber Company as issued, consisting of 1,330 shares, of $100 each, for the sum of $200,000, payable in the Bag Company's promissory notes of $33,333.33 each, payable in 1, 3, 4, 5, 6, and 7 years from date with interest at 6 per cent. payable to bearer or to the order of Durant, or such person as he might designate, the stock to be delivered to the National Trust Company, Limited, and indorsed in blank, and held as collateral security for the payment of the notes in question. The Bag Company was to pay off the direct advances made by the Sovereign Bank to the St. Gabriel Lumber Company for the current season's operations, estimated to amount to $45,000, and was to take over the logs cut during the past season and then in the woods and lakes, paying for them in cash, and for the provisions, feed, etc., on hand, estimated to amount to $25,000. Durant was to assume all the debts and liabilities of the St. Gabriel Lumber Company, including the indebtedness to the bank, with the exception of the mortgage loan of $100,000, and in consideration thereof was to receive all the live and liquid assets, namely, all the manufactured lumber and accounts receivable, and cash on hand or possessed by the Lumber Company, all of which were to be transferred to Alex. MacLaurin, to be held in trust by him for Durant until all the Lumber Company's debts and liabilities had been duly paid and discharged, when they were to be turned over to Durant. The Bag Company was to guarantee the $100,000 advance of the Sovereign Bank, and Durant was to deposit some of the purchase notes in MacLaurin's hands, to be held by the latter, so that, in the event of the liquid and live assets not being sufficient to pay the liabilities of the St. Gabriel Lumber Company, any deficiency might be deducted from said notes.

Negotiations for the purchase of this property had gone on for quite a few years with the Bag Company, which would only do business on the basis of getting all the stock of the company, although Durant had proposed the purchase of one-half the stock and an option on the other half. The failure of the Sovereign Bank of Canada quickened the desire of both parties apparently to bring about a purchase of the Lumber Company property, and the Bag Company was then willing to do business, as they figured they could get the property without paying cash, which was acceptable to Durant, since one of the features of the plan contemplated the satisfying of the Sovereign Bank's mortgage, or guaranteeing it, and thus preventing foreclosure. Durant accepted the proposition made by the Bag Company in writing on March 17, 1908, subject to certain minor modifications. In the course of his letter of acceptance Durant said:

"I expect to be able to deliver all the outstanding stock of the St. Gabriel Lumber Company, Limited, but have not been able to give this matter the necessary attention since I received your letter. At that time, however, I understood from Mr. Mitchell and your Mr. Barrett that the 10 days allowed me would be extended."

It will be seen that on the actual closing of the transaction the amounts of the notes were modified, so as to provide for payment at the end of the first year of a sufficient sum to pay for all the plaintiffs' stock; that the next notes were made to an aggregate of $72,063.90, to pay Durant's indebtedness to Wm. C. Sheldon & Co.; and that the remaining notes were made in amounts agreed upon to Durant's own order. The Union Bag & Paper Company agreed in writing to the modifications suggested by Durant.

It appears from the testimony of Sheldon that his firm (Wm. C. Sheldon & Co.) had a debit against Durant for which it held stock of the St. Gabriel Lumber Company belonging to him as security, and that after he had received from McManus the shares of stock belonging to plaintiffs, with the executed powers of attorney, he delivered all the stock to Victor E. Mitchell, who was the attorney for the Union Bag & Paper Company, and who also appears to have represented Durant and the St. Gabriel Lumber Company. He was unable to explain why this transfer was made to Mitchell, instead of directly to the Bag Company; he being one of its directors. Sheldon denied that he had received any profit, commission, or compensation of any kind in connection with this transaction, and said that all that his firm got were the notes to the amount of $72,063.90, representing payment of Durant's indebtedness to them. He also testifies that the outstanding note (No. 16) for $13,-333.34, is held by Barrett as security for the payment by Durant of the debts and liabilities of the St. Gabriel Lumber Company which he assumed at the time of the sale. On being called for the defense Sheldon testified that he delivered the stock in question to Mitchell pursuant to Durant's instructions, and assumed he was then turning it over to the Bag Company. The indebtedness of Durant to his company was practically the result of a loan which he had made to Durant to enable the latter to invest the original $50,000 in this enterprise.

The testimony of Garrison and McManus is to the effect that, while they knew in a general way that the sale of their stock was to be made

to the Union Bag & Paper Company, at no time had they the slightest information of the details of the sale as it finally went through, nor did they ever acquire such information until the real situation was disclosed in their New Jersey suit, nor did they ever know or have reason to suspect that Durant was realizing more than par for their stock. Durant's testimony for the defense does not materially conflict with that of the plaintiffs as to the initiation of the company, or the unsuccessful efforts to effect a sale to the Union Bag & Paper Company. The first vital difference between them comes in Durant's version of his conversation in January, 1908, with McManus. He says that McManus then proposed that they delay any foreclosure proceedings which the Sovereign Bank might bring, but that he replied that nothing of the sort could be done in view of the agreements between him and the bank, and that because of their relations such a course of action would not be proper. Durant then asked McManus if he would be willing to take par for his stock if he could so arrange it, and testifies that McManus replied that he would be very glad to do so if he could obtain par in the form of cash or short time notes, but that he would much prefer cash, and that Garrison would be glad to do the same. Durant claims he then said: "Well, then, I can proceed on the assumption that you will take par for your stock, and go ahead on the deal?" to which he says McManus replied, "Yes," and then asked, "Why can't I go in with you and Sheldon on this deal?" to which Durant says he answered, "You can; you are perfectly welcome to go into any deal that I make, if you will share the same responsibilities." He then says that McManus asked him how much he was going to get · for his stock, but before Durant could answer that question he withdrew it, saying:

"After all, it is no business of mine what you get for your stock, so long as I get par for ours."

He withdrew his question and absolutely declined going in on any new deal, saying neither he nor Garrison wanted to take any further responsibility. Durant says he then offered to go in with McManus on any scheme he might suggest; but the only thing the latter could offer was holding off the bank. Durant claims that at this time he explained to McManus that the former's interest would have to remain in the company for some time; that "I did not know what I would ultimately receive out of the thing; that in the way the thing would have to be carried out I would have to stay in the company—stand by the company or in connection with it." He said that he thought that the papers which were signed had been dictated to him by Sheldon. Durant says that, when he met McManus after the transaction had been closed, the latter said that he and his associates did not know about this $200,000 being received for the stock of the company and that they wanted an explanation of it. Durant then proceeds to testify:

"There were lots of expenses to be incurred, there were liabilities to be incurred, there were lawsuits which I had to meet, and whether I won or lost there would be expenses, and many things of that nature, and I said, 'Anyway, it has nothing to do with you that I can see.' He said, 'Oh, yes, he thought it had; that they were entitled to an explanation as to that;' to

which I replied that I did not see how he was entitled to any explanation—that if there had been a million dollars over it was mine without any explanation. I said, 'As a matter of fact, as near as I can judge, there will be very little left when this is all through and done, but whether there is or not does not concern you; you refused to take any liability, and were satisfied and expressed a desire to get par for your stock, and you made this remark,' which I repeated here, 'you at one time said, "Why couldn't you go in with Sheldon and myself?"' In explanation of that I may say here there was nothing to go in with Sheldon and myself. There was nothing to be gained by any further interview, and as I left and went to the door I said, 'You think I have skinned you, do you?' He said, 'No; I don't want to think that.' I forget what the final words were—probably good day, or good-bye, or something of that sort."

According to the agreement entered into at Montreal, April 18, 1908, between the St. Gabriel Lumber Company, Limited, Howard M. Durant, and Alex. MacLaurin, the trustee, the debts of the St. Gabriel Lumber Company, assumed by Durant, amounted to $96,981.06, and the live or liquid assets thereof, acquired by Durant under the agreement, amounted to $94,329.81. Durant, however, claims that this amount never has been realized for the property shown on the schedules. His liability under the agreement never has been determined, and he does not know whether it will result in a profit or a loss; note No. 16 still being deposited with the Trust Company to secure the Bag Company for any debit whatever. On cross-examination, Durant could not recollect having communicated to McManus, after the failure of the Sovereign Bank, the details of his negotiations with the Bag Company from October, 1907; but he did admit that, when he had his interview with McManus in New York on March 12th, he had received the written proposition of the Bag Company dated March 7th. He admitted the giving of the notes to Wm. C. Sheldon & Co. in payment of his indebtedness, which had been running over a period of years. It also appears that out of note No. 16, still due and unpaid, he had assigned $5,000 to Sheldon because of some claim or loss on Sheldon's part, the exact nature of which is difficult to gather from the evidence. He claims that when he talked with McManus on March 12, 1908, he did not know how much he was to receive for his own stock. He was unable to state definitely how much he would realize, or what the price per share was which would be paid him, for his stock, although he said it would be less than 150. He says that McManus never asked him what the Bag Company was going to pay for the St. Gabriel Lumber Company stock, nor what liabilities he would have to assume.

The aggregate of the notes received by Durant for the sale of $93,500 of stock was $160,500, of which $13,333.34 is still unpaid. On the basis of the total amount of the notes, he would have received $171 a share for his stock, as is shown by computation; while on the basis of what he has been actually paid, he has received $156 a share. There is a letter in evidence, written by Durant to the Bag Company on February 14, 1908, in which he says that he figures the liquid assets to amount to something over $20,000 more than the indebtedness. It appears that Durant was the practical manager and the experienced man in charge of the affairs of the St. Gabriel Company; none of the plaintiffs having had any experience in the business, nor undertaking

in any way to actively participate in the management or control of the company, which always remained under the complete direction of Durant. No dividends ever were paid on the stock of the company, and the only investor who ever realized anything in the way of profit during the life of the company was Durant, in the shape of salary during its continuance, and from the price he realized upon the sale of the stock.

While it is true that Durant had personally guaranteed the loan of credit with the Sovereign Bank to the amount of $175,000 on January 30, 1907, he wrote on April 23, 1907, to McManus saying:

"The bank here insists on my guaranteeing their loan to the St. Gabriel Lumber Company, and I. have about made up my mind that there is no way out of it. If this is done, it would be only right that all the other stockholders should join me in the guaranty; but this I suppose they will not wish to do. In connection with the above I feel that it is time to say that I am not receiving a salary adequate to the work done and the responsibility incurred, and I wish the salary to be raised to $8,000 a year, commencing with the current fiscal year. There is now no reason why this should not be done, for, while we did not meet with anticipated results at the start, we are more than doing so now."

McManus and Garrison, who was not then a director, agreed to the increase in Durant's salary to $8,000, and he received such salary thereafter; they not knowing at the time they agreed to such increase that Durant had already actually obligated himself months before to guarantee the company's indebtedness to the bank.

[1] This is not the ordinary case of misrepresentation, by which advantage is taken of a seller, for there is no proof of any actual misstatement by Durant of the terms of the purchase by the Bag Company of the stock in the St. Gabriel Company. The question whether or not the plaintiffs are entitled to hold Durant to an accounting must depend on the answer to the question whether he was under any duty to the plaintiffs of disclosure to them of the exact terms and conditions of the sale of the stock in the St. Gabriel Company to the Bag Company, and the other conditions of that sale by which the St. Gabriel Company parted with all its property and its business devolved upon the Bag Company. This is not a case of a large corporation, with many stockholders dealing with each other at arm's length, where each was at liberty to do as he pleased with his stock, regardless of its effects upon the other stockholders, and where, being upon an equal footing, no special trust or confidence was reposed in any particular stockholder. The St. Gabriel Company was a comparatively small corporation, whose stock at the time of the occurrences complained of was controlled by Durant, who owned about 70 per cent. thereof; the remaining 30 per cent. being owned by McManus, his sister (Mrs. Archer), and Garrison, and as McManus acted for his sister, as well as for himself, there were but three persons who ever were consulted in the slightest degree about the company's business. Of these, Durant was not only the president, manager, and a director, but exercised exclusive and unquestioned sway over the affairs and policy and business of the company, and, being the only one interested who had any practical experience in lumbering, his domination was never questioned by his associates.

The relations between the parties appear to have been always cordial down to the discovery of the real terms of the sale, and the confidence of Garrison and McManus in Durant was never shaken until then.   So he not only did not furnish them with the details of his earlier negotiations with the Bag Company, but they never pressed him for information on the subject, being content to trust his judgment and skill.   He was receiving a considerable salary for his services as president and manager, and while the results of the investment had not answered the expectations of the parties, they do not seem to have found fault with his business sagacity.   It is quite evident that the Bag Company always was considered a possible purchaser of the property, and it is also quite plain that the minority stockholders soon became willing, if not anxious, to sell their stock, and indicated that willingness by offering it to Durant at $90 and $115 at different times. It is Durant's contention, and has steadily been so, as indicated by his correspondence, that because Garrison and McManus were willing to take par for their stock they should be satisfied to get par, regardless of what profit Durant made therefrom, and regardless of what price he got for his own stock.   But this view overlooks entirely the fact that, while Garrison and McManus may well have been content to take par for their stock, it was only because they saw no way of getting any more, and there is no reason to believe that they would have been willing to take par, if they knew the Bag Company was buying their stock from Durant and paying him $150 a share for it.

As the Bag Company assumed none of the obligations of the St. Gabriel Company, but they were all taken over by Durant, except the Sovereign Bank mortgage, and as he took in return the liquid assets of the company, it is plain that the Bag Company, in paying $200,-000 for $133,000 of stock, was paying practically $150 a share.   It is quite true that Durant for some years had been doing all the financing of the St. Gabriel Company, and that McManus and Garrison, after arranging a first loan of $10,000 for the company, felt thereafter that they were under no obligation to raise any more capital for the company, and that Durant, as manager, should do so.   It is quite true, also, that Durant guaranteed the liabilities of the corporation to the Sovereign Bank of Canada to the extent of $175,000, but for this he was given an extra salary of $3,000 a year.   It is characteristic of Durant's lack of appreciation of any duty of disclosure which he owed to his associates that he obtained this increase of salary on the statement that he would be obliged to guarantee the indebtedness, concealing from them the fact that he had already actually assumed the obligation some three months before.   It is also true that the plaintiffs received pay for their stock in short term notes, while Durant paid off his obligations to Sheldon & Co. by the middle term notes, and kept the long term notes for himself.   But this may well have been done to satisfy the plaintiffs and the more readily obtain the transfer of their stock, and there is no suggestion that any of the notes at any time were anything else than gilt-edged security.

Durant claims that, because he took over the liquid assets of the St. Gabriel Company and undertook the payment of its debts, thereby

incurring a greater risk than that devolving upon his associates, he is entitled to more consideration than they were, and should be paid for the burden he assumed. But all this contention is met by the answer that if he had told the full details of the proposed sale to his associates they might have been ready to take their share of the risk, and, indeed, there is no reason why they should not have been perfectly willing to do so, in view of the large additional compensation which would have been paid them for their stock. If the plaintiffs had known at the time that the Bag Company was willing to pay them nearly $20,000 more for their stock holdings, there can be no doubt what their answer would have been if they had been asked to participate in the whole deal. If, on the other hand, after such disclosure, plaintiffs had been unwilling for any reason to take their proportionate share in the transaction, Durant would then have been at perfect liberty to go ahead and carry it through, paying plaintiffs par for their stock and making the profit for himself. But I think that, as between parties sustaining the relationship to each other that Durant (the majority stockholder and in absolute control of the company) did towards Garrison, McManus, and Mrs. Archer (the minority stockholders), who were absolutely dependent upon his business judgment and integrity, Durant owed a duty of full and complete disclosure which upon this record he never sought to discharge.

It is impossible to resist the conclusion that, knowing that plaintiffs would be glad to take par for their stock, while they were ignorant of any better market for it, he made the best terms that he could for the sale of all the stock of the company, not merely realizing a higher price for his own stock, but making a profit upon the investment of his associates as well. Such a course of action is opposed to sound business morality and should find no support in law. Durant never gave any intimation to his associates that he was trafficking in their stock, or that he proposed to deal with it as his own. When the option was given in 1905, it was given in Durant's name. When the sale took place in 1908, Durant's name nowhere appears in the powers of attorney or in any other paper in connection with the sale, and in his very answer in this suit Durant denied that he was the purchaser of the stock, although the court has found to the contrary.

A case having many features in common with the one at bar is that of Strong v. Repide, 213 U. S. 419, 29 Sup. Ct. 521, 53 L. Ed. 853. In that case Mrs. Strong was the owner of 800 shares of the capital stock of the Philippine Sugar Estates Development Company, Limited, which were sold and delivered by her agent to the defendant. She sued to recover them from the defendant on the ground that he had fraudulently concealed from her agent facts affecting the value of the stock. Repide was the owner of 30,400 out of 42,032 shares issued by the company, was a director thereof, and its administrator general. The company was one of the owners of the "friars' land," and Repide had rejected the government's offer for the purchase of the lands owned by the company without any consultation with the minority stockholders. He kept insisting upon a higher price than the government was willing to pay until the other owners agreed to

pay him $335,000 out of their purchase price, and the government agreed to exclude 1000 hectares out of the sale by his company. The contract of sale was signed by Repide as attorney in fact for his company in December, 1903. The negotiations for the purchase had been proceeding for some time; the government first beginning to make inquiries about a possible sale in 1902, and making an offer for the property July 5, 1903. The possibility of government purchase was all this time a matter of public notoriety. While the negotiations were progressing, and before the final offer was made, Repide took steps to purchase Mrs. Strong's shares, which were in the possession of her agent, and, without disclosing any of the information in his possession as to the progress of the negotiations for the sale of, the company's land, was able to purchase Mrs. Strong's stock on October 10, 1903, for $16,000 Mexican currency, while within 2½ months the shares were worth $76,256 U. S. currency. No misrepresentations were made in that case, but the defendant's liability was predicated upon the theory of his failure to disclose the real state of facts which had an important bearing upon the value of the plaintiff's stock. In the Repide Case there was the additional element that he had employed one Kaufman, a connection of his by marriage, to carry on the transaction, who in turn employed one Sloan, a broker, telling Sloan that the stock was for a member of his wife's family. Leaving out of consideration this additional element of fraud which was present in the Repide Case, the opinion of Mr. Justice Peckham, quoting so much of it as is peculiarly pertinent to the present case, lays down a rule as to the duty of disclosure which makes the defendant Durant liable to account herein. He said:

"The question in this case, therefore, is whether, under the circumstances above set forth, it was the duty of the defendant, acting in good faith, to disclose to the agent of the plaintiff the facts bearing upon or which might affect the value of the stock. If it were conceded, for the purpose of the argument, that the ordinary relations between directors and shareholders in a business corporation are not of such a fiduciary nature as to make it the duty of a director to disclose to a shareholder the general knowledge which he may possess regarding the value of the shares of the company before he purchases any from a shareholder, yet there are cases where, by reason of the special facts, such duty exists. The Supreme Courts of Kansas and of Georgia have held the relationship existed in the cases before those courts because of the special facts which took them out of the general rule, and that, under those facts, the director could not purchase from the shareholder his shares without informing him of the facts which affected their value. Stewart v. Harris, 69 Kan. 498, 77 Pac. 277, 66 L. R. A. 261, 105 Am. St. Rep. 178, 2 Ann. Cas. 873; Oliver v. Oliver, 118 Ga. 362, 45 S. E. 232. The case before us is of the same general character. On the other hand, there is the case of Tippecanoe County v. Reynolds, 44 Ind. 509–515, 15 Am. Rep. 245, where it was held (after referring to cases) that no relationship of a fiduciary nature exists between a director and a shareholder in a business corporation. Other cases are cited to that effect by counsel for defendant in error. These cases involved only the bare relationship between director and shareholder. It is here sought to make defendant responsible for his actions, not alone and simply in his character as a director, but because, in consideration of all the existing circumstances above detailed, it became the duty of the defendant, acting in good faith, to state the facts before making the purchase. That the defendant was a director of the corporation is but one of the facts upon which the liability is asserted, the existence of all the others in addition making such a combination as rendered it the plain duty of the defendant to speak. He was not only

a director, but he owned three-fourths of the shares of its stock, and was, at the time of the purchase of the stock, administrator general of the company, with large powers and engaged in the negotiations which finally led to the sale of the company's lands (together with all the other friar lands) to the government at a price which very greatly enhanced the value of the stock. He was the chief negotiator for the sale of all the lands, and was acting substantially as the agent of the shareholders of his company by reason of his ownership of the shares of stock in the corporation and by the acquiescence of all the other shareholders, and the negotiations were for the sale of the whole of the property of the company. By reason of such ownership and agency, and his participation as such owner and agent in the negotiations then going on, no one knew as well as he the exact condition of such negotiations. * * * The lands were the only valuable asset owned by the company. * * * The inference is inevitable that, at this time, he had concluded to press the negotiations for a sale of the lands to a successful conclusion. * * * Concealing his identity when procuring the purchase of the stock, by his agent, was in itself strong evidence of fraud on the part of the defendant. * * * The whole transaction gives conclusive evidence of the overwhelming influence defendant had in the course of the negotiations as owner of a majority of the stock and as agent for the other owners, and it is clear that the final consummation was in his hands at all times. If, under all these facts, he purchased the stock from the plaintiff, the law would indeed be impotent if the sale could not be set aside or the defendant cast in damages for his fraud. * * * The case before us seems a plain one for holding that, under the circumstances detailed, there was a legal obligation on the part of the defendant to make these disclosures."

And if the duty of disclosure was incumbent on Durant, his obligation was that of a full and complete disclosure, and it is not sufficient for a person in a fiduciary capacity to say, "I gave you sufficient information to put you upon inquiry." Sir George Jessel, in Dunn v. English, L. R. 18 Eq. 535; Costa Rica Company v. Forwood, L. R. 1 Ch. 746.

[2] Viewing the transaction in question, not as a sale of the stock of the plaintiff to Durant individually, but as a sale of the entire assets of the company effected by the majority stockholder, an equally stringent rule has been laid down in Wheeler v. Abilene Nat. Bank, 159 Fed. 391, 89 C. C. A. 477, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917:

"A corporation holds its property in trust for its stockholders. The stockholders have a joint interest in the same property and in the same title. Community of interest in a common property or title imposes a community of duty and a mutual obligation to do nothing to impair either. It creates such a fiducial relation as makes it inequitable for any of those who thus share in the common property to do anything to or with it for their own profit, to the detriment of others who have the same rights. * * * His [majority stockholder] power to control and direct the action of the corporation places him in its shoes, and constitutes him the actual, if not the technical, trustee for the holders of the minority of the stock. * * * In effect he holds an irrevocable power of attorney from the minority stockholders to manage and to sell the property of the corporation, for himself and for them. * * * This devolution of unlimited power imposes on a single holder of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through him, the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property. Any sale of the property of the corporation by him to himself for less than he could

obtain for it from another, or any other act in his interest to the detriment of the holders of the minority of the stock, becomes a breach of duty and of trust"—citing many cases.

See, also, Black v. Simpson, 94 S. C. 312, 77 S. E. 1023, 46 L. R. A. (N. S.) 137; Commonwealth Title Co. v. Seltzer, 227 Pa. 410, 76 Atl. 77, 136 Am. St. Rep. 896; Barber v. Martin, 67 Neb. 445, 93 N. W. 722; Merrill v. Sax, 141 Iowa, 386, 118 N. W. 434.

[3] Nor is there any force in the contention that plaintiffs, by retaining the notes given to them in payment for their stock and accepting the proceeds thereof, ratified the sale on such terms and waived their right to bring this action. The plaintiffs are not seeking to rescind the sale of their stock to the Bag Company on the actual terms on which that sale was carried out, not finding any fault with the terms under which such sale was effected. On the contrary, they stand upon that sale, but ask that Durant, who abused their confidence and trust by failing to disclose the true nature of the transaction, account to them for the profits, which he made upon the sale of their stock. This right they asserted as soon as they learned the real nature of the transaction, which was after they had commenced their suit in New Jersey. It follows that plaintiffs are entitled to judgment for an accounting from Durant for the profits realized by him upon the sale of the plaintiffs' stock.

Upon the record before us it is impossible to determine what profit was so realized by Durant, and therefore there must be a reference to determine same. As to the defendants Sheldon and Prentice, there is no proof justifying any recovery against them. The testimony does not justify a finding that George R. Sheldon was a party to Durant's transactions, or assisted him in any way in his suppression of the facts, or that his firm realized more out of the transaction than the repayment by Durant of his lawful indebtedness to them. While there is much vagueness and uncertainty as to what was really represented by the $5,000 which Durant assigned to Sheldon out of note No. 16, there is not sufficient evidence to justify a finding that it represented a participation by Sheldon in Durant's profits. The judgment appealed from will therefore be affirmed, with costs, as to the respondents Sheldon and Prentice, and as to the defendant Durant it will be reversed, with costs, and judgment directed in favor of the plaintiffs for an accounting by him of all profits realized by him over and above the par value of plaintiffs' stock.

Disposition is made of certain of the findings herein as follows:

The following findings of fact are reversed as not warranted by the evidence: XIII, XXI, XXIII, XXV, XXVIII, XXX, XXXI, XXXIX, XLV, XLVI, XLVII, XLVIII, XLIX, L, LIV, LVI, LVII, LVIII, LXV, LXVI, LXVII, LXVIII, LXIX, LXX, LXXI, LXXII, LXXIII, LXXIV, LXXV, LXXVII, LXXXIV, LXXXVI, LXXXVII, LXXXVIII, XC, XCII, XCIII, XCV, XCVI, XCVII, XCVIII, XCIX, C, CII, CIII, CV, CVI.

The following findings of fact are modified: III. After the word and figures "in 1901" insert, "after Durant had told him that he had been interested largely in purchasing tracts of timber land either for customers or as a broker." VI. By adding, after the word "Garrison," "participated in." XIX. By adding, after the words "advised

the plaintiff McManus that he had," the word "some," and striking out the words "such a" before the word "plan." XX. By striking out all after the word "situation." LIX. By striking out all after the word "Archer." LX. By striking out all after the word "indebtedness" before the word "stating."

The following conclusions of law are also reversed: I to XIII, inclusive.

The following findings of fact proposed by plaintiffs are hereby found: 8, 9, 10, 13, 19, 21, 22, 33, 34, 35, 36, 37, 38, 40, 41, 42, 43, 44, 45, 46, 47, 47½, 51, 52, 53, 58, 59, 62, 64, 68, 72, 73, 74, 75, 78, 79, 80, 88, 94, 96. And the following conclusions of law: 2, 5, 6, 7, 8, 10, with a final conclusion that plaintiffs are entitled to judgment against the defendant Howard M. Durant that he account to them for the profit realized upon the sale of plaintiffs' stock in the St. Gabriel Lumber Company by him.

Costs of the appeal and of the trial are awarded to plaintiffs as against Durant. Judgment affirmed, with costs, as to respondents Sheldon and Prentice, and as to defendant Durant reversed, with costs, and judgment directed in favor of plaintiffs as stated in opinion. Settle order on notice.

CLARKE, SCOTT, and HOTCHKISS, JJ., concur. INGRAHAM, P. J., dissents.