WILLIAM E. LEWIS, Plaintiff, *v.* BENJAMIN ADRIANCE, WALTER J. GREEN and JAMES DePEYSTER LYNCH, Defendants.

(Supreme Court, Oneida Special Term, August, 1916.)

*Accounting — " voting trustees " — appropriating moneys alleged to belong to plaintiff as depositing stockholder — judgment for defendants.*

ACTION for an accounting.

Lewis, Foley & Foley (W. A. Matteson, Bronner & Ward, of counsel), for plaintiff.

Lynch, Willis & Titus (James F. Hubbell, Emerson M. Willis, Charles A. Miller, Charles T. Titus, of counsel), for defendants.

CROUCH, J. This action is brought for an accounting by defendants and a judgment directing them to pay over certain moneys in their possession alleged to belong to plaintiff.

The evidence shows that the Savage Arms Company was incorporated under the laws of the state of New York and began to do business in or about 1899. At the time of the transaction in question and for some time prior thereto the defendant Adriance was president, defendant Green vice president, and defendant Lynch secretary-treasurer. These gentlemen had the active management of the business of the company. The stock of the company prior to 1915

had a market value of about $100 per share. In November, 1914, the Savage Arms Company secured the right to manufacture an automatic machine gun known as the "Lewis Gun." To procure the capital necessary for the manufacture of that gun, the capital stock was increased from 7,000 shares to 10,000 shares. Of these 3,000 shares of increased capital stock about $125,000 worth was taken by the stockholders and the public and $175,000 worth was taken by the syndicate of which Charles S. Symonds was manager, in which syndicate the plaintiff Lewis participated. The syndicate shares of the plaintiff, however, are not involved in this action which is confined to his individual holding of 82 shares. The acquirement of the right to manufacture the Lewis gun made the stock of the Savage Arms Company more desirable. Early in the year 1915 it became apparent that the stock was being picked up on the market. Certain of the stockholders, a majority, for their mutual protection then entered into an agreement dated April 20, 1915, by which they bound themselves to sell no stock for a period of two years.

Subsequently and under date of June 21, 1915, another agreement was entered into by substantially the same stockholders together with other stockholders whereby they agreed to deposit their stock with Adriance, Green and Lynch as voting trustees for a period of five years, said trustees to possess all rights of every name and nature including the right to vote in respect to any and all shares deposited; except that the stockholders were to be entitled to receive the dividends. Some but not all of the stock was deposited thereunder.

By an agreement dated July 3, 1915, substantially the same stockholders, including plaintiff in this action, authorized and empowered Adriance, Green and Lynch or a majority of them " to sell and dispose of all our holdings of capital stock in such company,

and all our right, title and interest therein, **to** such persons as they may deem advisable, for the sum of at least Three Hundred Dollars ($300.00) per share. And we further authorize and empower the said Benjamin Adriance, Walter Jerome Green and James DePeyster Lynch to charge such purchaser and to collect from him such sum for their services as they may deem advisable."

By November 15, 1915, 7,100 shares of stock including the 82 shares belonging to the plaintiff herein had been deposited in the Utica City National Bank assigned in blank by the respective owners.

Under date of November 23, 1915, an agreement was entered into " by and between Benjamin Adriance of Woodcliff Lake, Bergen County, New Jersey, Walter Jerome Greene and J. DePeyster Lynch, both of Utica, New York, stockholders of the Savage Arms Company, for and on behalf of themselves and of any other holders of the stock of Savage Arms Company who may join with them by the deposit and sale of their said stock hereunder, parties of the first part, hereinafter designated ' the sellers ' and Driggs-Seabury Ordnance Company, a corporation organized and existing under the laws of Delaware   *   *   * hereinafter designated ' the Purchaser.' "

By this agreement, the sellers agreed to sell and transfer approximately 7,100 shares of the Savage Arms Company stock for $500 in cash per share. That agreement contained the following provision:

" *Fifth.* The Purchaser agrees to pay said Adriance, Green and Lynch coincidently with making payment for the stock of the Savage Arms Company as hereinabove provided, the further sum of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000) upon receipt from, and in consideration of contracts duly executed by the Sellers in form satisfactory to counsel for the Purchaser, in and by which contract the Sellers will agree and bind themselves not to en-

gage within the limits of the United States of America in the manufacture or sale of fire arms or munitions for a period of five (5) years from the date hereof, without the consent in writing of the party of the second part hereto.''

The stock certificates assigned in blank representing 7,100 shares were in the possession of the defendants in New York when this agreement was executed and were deposited according to the terms of that agreement with the Franklin Trust Company of New York. One hundred thousand dollars in cash was paid down on the execution of the agreement and was deposited by Mr. Lynch in the Utica City National Bank.

Under date of November 24, 1915, the stockholders whom Adriance, Green and Lynch were representing, including the plaintiff in this action, signed a document reciting in the premises that Adriance, Green and Lynch had on November 23, 1915, entered into a written agreement with the Driggs-Seabury Ordnance Company whereby they had, for themselves and for all other stockholders who might desire to become parties to such agreement, sold to said Driggs-Seabury Ordnance Company 7,100 shares of the capital stock of the Savage Arms Company at $500 per share which stock had been deposited with the Franklin Trust Company of the city of New York in escrow to be delivered by said Franklin Trust Company upon the payment to it of the purchase price provided for in said agreement; and further reciting as follows: '' Said agreement further provides that the said Adriance, Green and Lynch, in consideration of the sum of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000) to be paid to them by the said purchaser, should enter into a written agreement not to engage in the manufacture or sale of fire arms or ammunition within the limits of the United States of America for the period of five (5) years from the

date thereof, without the consent of the Driggs-Seabury Ordnance Company first had and obtained in writing.''

And thereupon said document in terms ratified and confirmed said agreement of November 23, 1915, in all respects and further authorized and empowered Adriance, Green and Lynch to sign all further agreements, if any, necessary to complete said transaction.

Subsequently and about the middle of January, 1916, the Driggs-Seabury Ordnance Company under the agreement of November 23, 1915, with Adriance, Green and Lynch paid an aggregate sum of $5,300,-000 less the down payment of $100,000, of which $3,550,000 was distributed to the depositing stockholders and $1,750,000 was retained by Adriance, Green and Lynch. The plaintiff received on account of his eighty-two shares the sum of $41,000; that is, he received $500 per share for each of his eighty-two shares.

The claim of the plaintiff is that the $1,750,000 belongs *pro rata* to the former owners of the 7,100 shares, and this action is in effect brought to recover his *pro rata* share thereof. That claim rests upon two contentions.

*First.* That under the terms of the agreement of November 23, 1915, with the Driggs-Seabury Ordnance Company, the $1,750,000 was paid for contracts not to engage in the same business to be executed by '' the sellers,'' that '' the sellers '' as that term was used therein, meant all depositing stockholders, not Adriance, Green and Lynch alone; hence, that, as it was all the depositing stockholders who furnished the consideration for the $1,750,000, they were the persons entitled to the money.

In passing it may be said that defendants, for the purposes of their own argument, also construe the term '' the sellers '' as meaning all the stockholders. The court, however, takes a different view. While, of

course, the owners were in the end literally the sellers of the stock, nevertheless, it was " the parties of the first part," to-wit, Adriance, Green and Lynch, who were " hereinafter " designated " the sellers." That phrase was not necessarily one of description; it was one of convenience. Such an omnibus term is common enough in modern drafting and conveyancing. Any other term, as, for instance, " the triumvirs " or " the trinity " would have done equally well. The character in which " the sellers " were acting was " for and on behalf of themselves and of any other holders of stock of Savage Arms Company who may join with them by the deposit and sale of their stock hereunder." But the other holders of stock were not and did not purport to be parties of the first part, except as they were represented by Adriance, Green and Lynch. Clearly these three men were " the sellers," because they were the ones named who, on behalf of themselves and others, were about to make certain agreements and it was convenient to designate them thereinafter by that phrase. An examination of the body of the document bears out this construction drawn from its premises.

It must be borne in mind that when this agreement of November 23, 1915, was drawn and executed, Adriance, Green and Lynch were in New York with the stock in their possession, clothed with such power (and only with such power) as the voting trust agreement of June 21, 1915, and the authorization agreement of July 3, 1915, gave them.

In the 1st paragraph " the sellers," that is, Adriance, Green and Lynch, agree to sell, as they had the authority to do; and they will " do and execute and cause to be done and executed all assignments, etc.," because they could only do and execute assignments of their own stock. The words underscored were unnecessary, if all the stockholders were " the sellers " referred to.

Again, in paragraph 2d, the sellers agree forthwith upon the signing of the agreement to deposit with the Franklin Trust Company certificates of stock, etc. But the holders had already placed the certificates with Adriance, Green and Lynch, who as " the sellers " were alone in a position forthwith to deposit them. In the same paragraph one reads that " the sellers * * * will further, from time to time deposit with said trust company certificates similarly endorsed and stamped for such additional shares * * * as may be delivered to the sellers by the holders thereof for sale and delivery hereunder." Here is a perfectly clear distinction between " the sellers " and the stockholders.

Paragraph 3d in nowise conflicts with this construction. The Driggs-Seabury Company was dealing with Adriance, Green and Lynch individually and as duly authorized agents; it was not dealing directly with those stockholders for whom Adriance, Green and Lynch were acting. The sum of $100,000 was to be paid over in a lump to the account of Adriance, Green and Lynch, the agents; not in *pro rata* sums to the parties whom they represented.

Again, in paragraph 4th, " the sellers " covenant concerning the voting of the stock — a covenant which Adriance, Green and Lynch, voting trustees, alone could make.

In short, wherever that phrase or term is used, its application to Adriance, Green and Lynch is appropriate. The same is not true as to its application to the depositing stockholders. To hold, therefore, that " the sellers " as used in that agreement meant anybody else except Adriance, Green and Lynch would be a strained interpretation.

Paragraph 5th of the agreement of November 23, 1915, quoted above must mean, then, that the Driggs-Seabury Company was to pay Adriance, Green and Lynch $1,750,000 in consideration of contracts not to

engage in the same business to be executed by them, not contracts to be executed by the depositing stockholders. Then arises at once the question whether the intention was that Adriance, Green and Lynch, '' the sellers,'' in executing the contracts not to manufacture, were to act for themselves and all other depositing stockholders, or for themselves alone. It must be admitted that the use of the term '' the sellers '' here was unfortunate. But I think it must be construed as meaning Adriance, Green and Lynch individually and not in a representative capacity.

Under the terms of the agreement of July 3, 1915, they had no authority to enter or bind the parties for whom they were acting by any such agreement as that made in paragraph 5th. Moreover, the agreement of November 24, 1915, does not purport to confirm or ratify any such unauthorized act. What it does ratify is the act of the agents in making a profit out of an agency transaction, an act which probably required ratification to render it valid. The inference is, therefore, that '' the sellers,'' as used in paragraph 5th, meant Adriance, Green and Lynch individually.

And that is the practical construction placed upon the phrase or term by the parties to the agreement in which it is used. Presumably the agreement of November 24, 1915, was drawn by the defendants. What they understood paragraph 5th to mean appears clearly in the recital thereof in that agreement.

While there is no direct evidence as to who, if anybody, actually executed and delivered contracts not to manufacture, it does appear that the entire consideration therefor was paid by Driggs-Seabury Company to defendants; and that, as stated above, defendants had no authority even by the terms of the ratification agreement to execute and deliver such contracts for anybody but themselves. The inference is that they were paid for contracts executed by themselves alone.

The argument of common sense leads to the · same conclusion. It was Adriance, Green and Lynch, not the other depositing stockholders, who knew the processes of manufacture, were familiar with the market and were in touch with the trade. To eliminate the possible competition of the former might conceivably warrant the payment of money; not so as to the latter.

Finally, it may be noticed that there is no evidence by plaintiff that he ever performed or offered or was willing or was asked to perform on his part the contract not to manufacture, the consideration for which he is seeking to recover in this action.

*Second.* But plaintiff contends that even if his construction of the agreement of November 23, 1915, is incorrect, nevertheless the $1,750,000 belonged rightfully to the depositing stockholders under the doctrine that " one who undertakes to act for another in any matter shall not in the same manner act for himself." I do not think this rule has any application here. The principal may not resort to a remedy thereunder when he has with knowledge of the facts confirmed the act of the agent. When the agents here had entered into the contract of sale dated November 23, 1915, with the Driggs-Seabury Ordnance Company they came immediately back to their principals and told them in plain terms what both the principals and agents were to get. If the plaintiff here had any objection to the profits which defendants were making, then was the time to let it be known. No objection was made. On the contrary, the contract, expressed in unmistakable terms, was confirmed.

While there is no evidence to show that the consideration mentioned for the $1,750,000, to-wit, the execution of contracts not to manufacture, was a mere cover for what is colloquially known as a " rake-off," still even if that were a fact I cannot see that it helps the plaintiff. The vital and essential point

which the agents were bound to bring to the attention of the principals was that they were getting $1,750,-000 out of an aggregate sum of $5,300,000 which the purchaser was willing to pay. The stockholders' agreement of July 3, 1915, contemplated a profit to the agents; and the principals who signed that agreement apparently did not care how large the profit was so long as it came from the purchaser and so long as they got $300 a share for their stock. Probably no such sum as $1,750,000 was at that time in the minds of any of the parties. Probably, also, no such sum as $500 a share was contemplated by any of them. That the profits of the agents were larger and that they were not expressed to be for services but for something else cannot, I think, affect the validity of the transaction in view of the fact that full information was given to the principals and that they assented thereto. Upon the whole case I think defendants should have judgment.

Judgment for defendants.