MARSHALL O. TERRY, Respondent, *v.* WALTER JEROME GREEN and Others, Appellants.

First Department, December 20, 1918.

Appeal — when objection that plaintiff had not proved cause of action alleged not reviewable — corporations — action by stockholder against other stockholders and officers to recover share in alleged secret profits from sale of stock — evidence of agency — instructions — duty of stockholders and officers to disclose terms of sale of stock.

Where a motion to dismiss upon the ground that plaintiff has not proved the cause of action alleged is not made until the close of the case when all the proof referred to has been received without objection, the question whether or not the proof was within the pleadings is not properly presented for review upon appeal.

In an action by a stockholder against other stockholders and officers of a corporation to recover the plaintiff's *pro rata* share in what he terms a secret profit obtained by the defendants while they are claimed to have been acting as agents for the stockholders in effecting the sale of substantially all of the stock, it was reversible error for the court to charge the jury as a matter of law that whether the defendants were plaintiff's agents depended upon whether plaintiff relied upon a letter by one of the defendants in making the sale of his stock under the agreement which had been negotiated by the defendants, where there was no evidence that said letter constituted an agreement.

It was also error to so charge the jury as to exclude their consideration of the alleged secret profit obtained by the defendants, as they were entitled to have the question of the good faith of the provision for the payment of such sum submitted.

If the alleged secret profit was simply a cloak to cover the payment of a premium or a larger price for their stock to the defendants than the other stockholders were receiving, the duty of disclosure would be upon the part of the defendants, not under any theory of agency, but as the officers of the corporation.

But if the agreement was actually one by which the stockholders were in fact to receive but the stated price for their stock, and the alleged secret profit was actually and in good faith to be paid to the defendants in consideration of their contracts not to engage in the former business of the corporation for a certain period, then the provision of the agreement for the payment of said profits was one in interest only to the defendants, and as it formed no part of the consideration for the purchase of the stock of the other stockholders, the latter could have no interest in it, were not entitled to any disclosure thereof, and could not complain of the transaction.

APPEAL by the defendants, Walter Jerome Green and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 27th day of February, 1918, as corrected by an order entered in said clerk's office on the same day.

The judgment was rendered upon the verdict of a jury. An appeal is also taken from an order entered in said clerk's office on the 22d day of March, 1918, denying defendants' motion for a new trial made upon the minutes.

*James F. Hubbell* of counsel [*Charles T. Titus* with him on the brief; *Nicoll, Anable, Lindsay & Fuller*, attorneys], for the appellants.

*Clarence De Witt Rogers* of counsel [*W. S. Jennings, W. C. Cannon* and *Stetson, Jennings & Russell* with him on the brief], for the respondent.

DOWLING, J.:

The Savage Arms Company was a corporation engaged in the manufacture of firearms at Utica, N. Y. It had a capital stock of $1,000,000, divided into 10,000 shares of a par value of $100 each. Plaintiff had been for a long time a stockholder in that company, holding 400 shares. The defendants Adriance, Green and Lynch (the latter now deceased) for many years had been respectively president, vice-president and secretary-treasurer of the corporation, and were actively in charge of its affairs. On June 22, 1915, Green wrote a letter to the plaintiff advising him that the price of the Savage stock had gone up of late and that some had been sold at $270; that apparently an attempt was being made to

accumulate it, but that if a few people stood together the move would be blocked; and that in order to prevent this accumulation, by reason of the increased price drawing out sufficient stock to change control, it had been determined to organize a voting trust, tieing up the stock for five years, with Adriance, Lynch and Green as voting trustees. The letter proceeded to state: " Lynch and I are going down to New York to-night and if it occurs to you that you would like to tie up your stock with the rest of us, you might intimate it to me over the telephone at the Hotel Manhattan. We will have the papers with us and can easily get them over to you for your signature." Plaintiff says that within a day or two there-after he met Green and Lynch at the Hotel Manhattan and they asked him to sign this paper joining the pool, to which he replied that he could not transfer his stock to a pool, but that he would consider himself a member thereof, and that nothing would induce him to sell to any one outside at any price. He says that Green replied that he would consider plaintiff a member of the pool. He admits that he was told that the parties were signing this pool agreement so that no one could get control of the stock; he says he did not even ask to see the agreement, because he told Green and Lynch he would not sign it; and that he refused to transfer his stock in blank to any one, but said he would join with them in the pool. He also said that he did not care what the paper was, because he had no intention of signing off his stock. This voting-trust agreement appears in evidence and contains no provision of any kind for the sale of the stock, but on the contrary is the customary pooling agreement, whereby the stock was to be held by the trustees for voting purposes for a certain period of time, in this case five years. It provided that the certificates to be issued thereunder should not be returned to the certificate owners until June 21, 1920, and the evident purpose of the agreement was to prevent a sale of the stock of the company and not to effectuate one. This agreement was signed by a number of the stockholders but there is no evidence that it ever became effective, that any stock was ever issued to the trustees, that any certificates were issued thereunder, or that anything was done pursuant to its terms or to carry out its purposes. The only pool evi-

denced by this agreement would have been a pool to have held the stock intact for a period of five years and not a pool to effect a sale of the stock. Nor does it appear that anything was said or done at the time this agreement was prepared, or when the plaintiff was solicited to sign it, which showed that any of the parties expected or intended to sell their stock. Everything indicates a contrary purpose, *i. e.,* to retain the stock and not to sell it. All that appears upon the question of a sale is plaintiff's bald statement that he declared himself to be a member of the pool, that Green had accepted him as such, and that the plaintiff would not sell under any circumstances except as he sold with them and that there was no price that he would accept other than to sell with them for whatever they got. There was also a condition which plaintiff says he made that there should be no sale of the stock to a German or a German syndicate, which he says the defendants accepted. Later negotiations were had for the sale of the Savage stock to the Westinghouse Company and the Bradley Company, and in July, 1915, a number of stockholders signed an agreement authorizing the defendants to sell their stock for at least $300 a share. This agreement was never signed by the plaintiff and he does not appear to have ever been asked to sign the same. It was signed by the individual defendants. Plaintiff claims that after his return from California to Utica, about November 13, 1915, he was told about the options given to the Bradley Company and the Westinghouse Company, and also of a proposed combination with the Stevens plant. On November 23, 1915, the agreement was made which furnishes the basis for the present action. It was entered into between Benjamin Adriance, Walter Jerome Green and J. DePuyster Lynch, stockholders of the Savage Arms Company, " for and on behalf of themselves and of any other holders of the stock of Savage Arms Company who might join with them by the deposit and sale of their stock hereunder," designated as the sellers, and the Driggs-Seabury Ordnance Company, designated as the purchaser. Thereunder the sellers (meaning the three defendants herein) agreed to sell and transfer to the purchaser approximately 7,100 shares out of a total authorized capitalization of 10,000 shares of the Savage Arms Company and " as many shares

of said stock in addition to said seven thousand one hundred (7100) shares as may be deposited with the Franklin Trust Company by the holders thereof for sale or exchange under this agreement." The sellers were also forthwith upon the signing of the agreement to deposit with the Franklin Trust Company certificates for 7,100 shares of the stock duly indorsed in blank and stamped for transfer and were to further deposit with said company certificates similarly indorsed for such additional shares of stock as might be delivered to the sellers by the holders for sale and delivery thereunder. The purchaser agreed to pay $500 per share in cash for each share of stock purchased under the agreement. It was further agreed that the purchaser should pay to the sellers upon or before the signing of the agreement $100,000 in cash to be applied on account of the purchase price of said stock, and in the event that the purchaser should fail to carry out its part of the agreement the sum of $100,000 was to belong to the sellers in full payment of liquidated damages because of such failure. It was further provided: " *Fifth.* The purchaser agrees to pay to said Adriance, Green and Lynch, coincidentally with making payment for the stock of the Savage Arms Company as hereinabove provided, the further sum of One million seven hundred fifty thousand dollars ($1,750,000) upon receipt from, and in consideration of contracts duly executed by, the sellers in form satisfactory to counsel for the purchaser, in and by which contracts the sellers will agree and bind themselves not to engage, within the limits of the United States of America, in the manufacture or sale of firearms or munitions for a period of five (5) years from the date hereof, without the consent in writing of the party of the second part hereto."

A careful reading of the agreement shows that what the Driggs-Seabury Company was interested in buying was: *First,* the 7,100 shares of stock which the defendants had accumulated, including their own stock, and which represented more than two-thirds of the capital stock of the Savage Company. The certificates for these shares the defendants held and they were the shares which they deposited pursuant to the terms of the agreement and which entitled them to have the agreement carried into effect by the purchaser. It included not only the defendants' personal stock but also the

stock which they had been authorized to sell for at least $300 a share by the agreement of July 3, 1915. That agreement the plaintiff had not signed nor were his 400 shares of stock included in the 7,100 shares which the defendants sold and the certificates for which they deposited with the Franklin Trust Company. These 7,100 shares of stock were what the purchaser insisted upon getting. It did agree to pay $500 a share for any additional stock which was turned into the Franklin Trust Company under the agreement, but that provision evidently was for the benefit of the remaining minority stockholders and not for the benefit of the purchaser, for when the defendants turned in the 7,100 shares of stock and executed their individual contracts to refrain from competition they became entitled to full payment and plaintiff's stock did not figure at all in the transaction. The second consideration moving the purchaser to buy this stock was to prevent any possibility of competition upon the part of the defendants herein who alone had that knowledge, experience and ability in the firearms business that made them a source of danger as competitors of the purchaser's business. It was for this reason and because of the possibilities of future opposition in a manufacturing way from the defendants that the purchaser agreed to pay the sum of $1,750,000 as provided in the 5th paragraph of the agreement; at least that is a fair and reasonable inference from the agreement, read in the light of the surrounding circumstances. In any event, the defendants did not undertake to act in any way in regard to the plaintiff's stock under this sale, but Green, one of the defendants, did inform the plaintiff, who was his intimate friend for thirty years, of the agreement for the sale of the stock. On December 1, 1915, Green wrote a letter directed to the plaintiff at Fort Myers, Fla., where he had gone, telling him that it had been arranged to turn the company over to the Driggs-Seabury Ordnance Company and that the arrangement was that the latter was to take over all stock, paying therefor either $500 a share or giving four shares of its stock in exchange for one of the Savage Company. Further details were given including the name and address of the depository and the fact that they had over 7,000 shares of stock in its hands then and advising plaintiff that he could turn his stock directly

over to them or put it in the care of a Mr. Hall as he saw fit. This letter contains substantially all essential details of the agreement except that it makes no reference to the $1,750,000 provided to be paid to the defendants. The exact date when this letter was received by the plaintiff is not clear. Plaintiff claims that he received it before he deposited his stock. Green testifies that after mailing it to Florida he learned the plaintiff was at Mamaroneck, N. Y., and there telephoned him all the details of the Driggs-Seabury agreement including the fact that Green was to get the equivalent of $1,000 a share for his stock, approximately, instead of the $500 a share which the stockholders were to get, and that plaintiff said that Green had stuck to the company for a great many years and that he would be entitled to $1,000 a share. Green claims that in this telephonic communication he explicitly told the plaintiff that the defendants were to get a substantial amount in addition to their $500 a share, which would make the return to them about $1,000 a share. The plaintiff's testimony does not effectively or frankly meet Green's testimony in these particulars. As the result of his talk with Green plaintiff saw Lynch who told him the defendants had deposited their stock and when plaintiff asked him when he should deposit his own stock he said the sooner the better, whereupon plaintiff did in fact deposit the stock the same afternoon. Plaintiff went to the Franklin Trust Company and did not turn his stock in through the intervention of the defendants, as the agreement provided. His 400 shares of stock he indorsed in blank and when the trust company tendered him a receipt he refused to accept it and drew up his own form of receipt dated December 7, 1915, by which he provided: " which shares are to be held pending the conclusion of the sale of Savage Arms Company in connection with the holdings of W. J. Green, Benjamin Adriance, and J. DePuyster Lynch. The stock to be held to be deposited only as per agreement between Messrs. Adriance, Green and Lynch and the Driggs-Seabury Ordnance Company, by a written arrangement of $500 per share to the Driggs-Seabury Ordnance Company." This form of receipt of course was not communicated to the defendants nor are they chargeable with notice thereof. The plaintiff's own action even as to the form of

receipt which he obtained is significant of his confidence in his own business ability. There is nothing in the receipt which indicates upon its face anything more than the desire to be sure that he was to get his $500 a share under an agreement to which he was not a party, but whose terms he knew, and under which he was anxious that his stock should be purchased. Plaintiff claims that he did not learn of the $1,750,000 payment until midnight of January 16, 1916, he having been paid his $200,000 for his stock on January fifteenth. This action has been brought to recover the plaintiff's *pro rata* share in what he terms a secret profit of $1,750,000, obtained by the defendants as aforesaid, while they are claimed to have been acting as agents for the stockholders of the Savage Arms Company in effecting the sale of substantially all its stock to the Driggs-Seabury Ordnance Company.

There are vital differences in the recollection of the parties as to what occurred at their various interviews. Thus both Green and Lynch deny that Green ever said that he would consider plaintiff a member of the pool. Lynch says that plaintiff read the original voting-trust agreement and said he would not give up his stock and would not sign anything, but that he would like to have the defendants let him know when they sold, as he did not want to be left out in the cold. Green says that plaintiff said he would not deposit his stock nor would he sign any paper, but he wanted to know when the defendants sold their stocks and that they agreed to tell him. Green testifies to his having given the information over the telephone as to what the defendants were to realize for their stock as heretofore stated, and Lynch testifies that plaintiff voluntarily came to him, said he had been talking with Green about the sale, and wanted to know what to do in order to get $500 a share for his stock, to which Lynch replied that he would have to go to the Franklin Trust Company, read the agreement and deposit his stock. Plaintiff's principal concern was to learn if he could not get his money the same day and he was told he could not get it until January fifteenth; he said he thought it was a good sale. He had previously told Green that he liked the price of $500 very much better than the $380 fixed in one of the other deals. The written agreement was on file with the Franklin Trust Company and plaintiff

refers to it in the receipt which he himself drew up, and still he claims he did not know that there was even a written agreement. There is also some uncertainty as to whether the party who, he says, showed him a copy of the agreement, from which he first learned of the $1,750,000 payment, actually had any such copy with him. These were all questions of fact, however, solved by the jury in favor of the plaintiff.

The recovery herein has been predicated upon two grounds: *First,* that the defendants were the agents of the plaintiff, acting in a fiduciary capacity for him, and that they misrepresented the terms of the contract of sale and particularly concealed from him the fact that these defendants were to obtain a secret profit of $1,750,000; *second,* that the defendants made a profit from the sale of the plaintiff's stock and as they sustained a trust relationship towards him they are liable upon the theory of money had and received. At the outset it is to be noted that the plaintiff utterly failed to prove the agreement set forth in his second amended complaint as the basis of this action. By the complaint it was set forth: *Third,* that during the latter part of the year 1915 defendants informed plaintiff that they were getting together a large quantity of stock of the said Savage Arms Company, including their own holdings and those of such other stockholders as might join them, for the purpose of selling said stock under defendants' management and direction to a single purchaser in order to obtain therefor the best price obtainable, and invited plaintiff to deposit his said shares with defendants for sale jointly with said other shares. Plaintiff thereupon offered defendants to deposit his said 400 shares of stock duly indorsed for transfer, with such depositary and in such manner as defendants might direct, for sale and delivery by defendants of the same jointly with said other shares, provided defendants agreed in consideration of such deposit that plaintiff should thereby become entitled to share in the aggregate price obtained for all stock so sold (including plaintiff's said shares, and all shares sold by defendants jointly therewith), equally with defendants and the other stockholders whose shares were so sold, *pro rata* in accordance with the number of their respective shares so sold, and agreed further that the purchaser to whom the sale should be effected should

not be a German. Defendants thereupon accepted said offer of the plaintiff and thereafter pursuant to its terms directed plaintiff to deposit his said stock duly indorsed as aforesaid, with the Franklin Trust Company for transfer jointly with said other shares to the Driggs-Seabury Ordnance Company. Thereupon plaintiff did, in accordance with the said defendants' direction, deposit with the Franklin Trust Company his said 400 shares of stock duly indorsed for transfer as aforesaid, and otherwise duly performed all of the conditions of said agreement on his part to be performed. Of such an agreement as that herein set forth there is no proof. This alleged agreement cannot be based upon the voting-trust agreement, for that is too early in point of time to correspond with the date assigned, nor does it provide for any sale of the stock. It must refer, if to anything, to Green's letter to plaintiff dated December 1, 1915, and mailed to plaintiff at Fort Myers, Fla. The letter bears out no such theory of an agreement as that set forth in the complaint, nor is there anything in plaintiff's testimony, even accepting it at its face value, which would prove the making of such an agreement as that alleged in the complaint. Had the objection been duly taken upon the trial that the agreement sought to be proved and the testimony offered in support of it were not within the pleadings the objection would have been good. But such objections were not taken in due time and although no motion was made to conform the pleadings to the proof the case was submitted to the jury upon the theories of liability indicated by the court in its charge and the plaintiff was not limited to the cause of action which he had set forth. Upon this record, however, the question is not properly presented for review, as the motion to dismiss upon the ground that plaintiff had not proved the cause of action alleged was not made until the close of the case, when all the proof referred to had been received without objection.

The first question submitted by the learned trial court to the jury was whether or not the defendants " acted in the nature of agents for the plaintiff with respect to the sale or disposition of the 400 shares of stock which he concededly owned in the Savage Arms Company." There is not sufficient evidence in this case to warrant a finding that the defendants were

the agents of the plaintiff. The sole ground upon which the theory of agency was based in the court below was that if the plaintiff relied upon Green's letter to him of December 1, 1915, in depositing his stock with the Franklin Trust Company for the purpose of its transfer and sale under the agreement made by the defendants, then the defendants must be deemed to have acted as the agents of the plaintiff. But we are unable to find anything in the letter itself which justifies such a finding. It amounts to no more than the communication to the plaintiff of the terms of sale to the Driggs-Seabury Company and is neither an acknowledgment, nor proof, of any agency upon the part of the defendants, so far as the plaintiff is concerned. It was not even deemed to be final by the defendant Green who wrote it, as he refers at the end of the letter to the fact that the plaintiff might soon return from Florida and he would like to talk the situation over with him. It is merely the communication of information as to a transfer accomplished as to defendants' interests, but dependent, as to plaintiff's stock, upon his own will. If there had been a prior agreement between the parties by which the defendants undertook to act, as plaintiff's agents, in relation to his stock, to represent him in the sale thereof, and to secure for him the same price as they themselves received upon the sale of their own stock, then this letter of Green's might be additional proof of the existence of such an agreement and of the continuance of such an agency. But, standing alone, we think the learned court was in error in charging the jury as a matter of law that whether the defendants were plaintiff's agents depended upon whether plaintiff relied upon this letter in making the sale of his stock under some agreement which had been negotiated by the defendants. To this exception was properly taken and we think it constitutes reversible error. The court further charged that if the defendants were the agents of the plaintiff and did not tell him about the $1,750,000 payment and plaintiff had no knowledge thereof, " the fact that $1,750,000 is paid, ostensibly for the reason that these three gentlemen would not go into a business of this kind, need play no part at all with you. I charge you as matter of law that, regardless of the way in which this is written, if they were to get $1,750,000, no matter

how it is explained, the plaintiff is entitled to a verdict — providing you find that the sale was made under the circumstances that I have explained to you, as claimed by the plaintiff, and in ignorance on his part of any provision with respect to this $1,750,000 payment." We believe that this was erroneous. We think that under the proof in this case the defendants were entitled to have submitted to the jury the question of the good faith of the provision for the payment to them of this $1,750,000. Of course, if that payment. was simply a cloak to cover the payment of a premium, or larger price for their stock, to the defendants than the other stockholders were getting, the good faith of the entire transaction would be destroyed and the agreement would be no longer one for the payment of $500 per share to all the stockholders, but an agreement to pay $500 to some and much more than that to the defendants. If such were the real agreement, the duty of disclosure would be upon the part of the defendants, not under any theory of agency but as the officers and managing directors of the Savage corporation. But if the agreement was actually one by which the stockholders were in fact to receive but $500 per share for their stock, and the sum of $1,750,000 was actually and in good faith to be paid to the defendants in consideration of their contracts not to engage in the manufacture of firearms or munitions for the period of five years, then this clause of the agreement was one in interest only to the defendants and as it formed no part of the consideration for the purchase of the stock of the other stockholders, the latter could have no interest in it, were not entitled to any disclosure thereof and could not complain of the transaction. As was said in *Lewis* v. *Adriance* (100 Misc. Rep. 725; affd., 179 App. Div. 958) it was these present defendants and not the other depositing stockholders who knew the processes of manufacture, were familiar with the market and were in touch with the trade and that to eliminate the possible competition of the former might conceivably warrant the payment of money, but not so as to the latter. Furthermore, in that case, as here, there was no evidence that plaintiff ever performed, or offered, or was willing, or was asked to perform on his part, the contract not to manufacture or sell firearms, part of the consideration

for which was sought to be recovered in both actions.  Furthermore, it was there said that defendants had no authority, even under the agreement, to execute and deliver contracts not to engage in the firearms business for anybody but themselves.  Upon this record it does not appear that defendants ever made any profit out of plaintiff's stock.  They never received his stock nor attempted to deal with it in any way.  Plaintiff handled his own stock, deposited it himself with the depository named in the agreement and received the purchase price therefor directly from it.  The case, therefore, is entirely different from the cases relied upon by the respondent herein, such as *McManus* v. *Durant* (168 App. Div. 643) in all of which there had been a transfer of the stock to the defendants, who had realized a profit from the resale or retransfer thereof.

The judgment and order appealed from will, therefore, be reversed and a new trial ordered, with costs to the appellants to abide the event.  The findings of the jury that the defendants were the agents of the plaintiff and that because of such agency the plaintiff is entitled to recover his *pro rata* share of the $1,750,000 are reversed.

CLARKE, P. J., LAUGHLIN and PAGE, JJ., concurred.

Judgment and order reversed and new trial ordered, with costs to appellants to abide event.