## CITY OF SAN DIEGO v. ATCHISON, TOPEKA & SANTA FÉ RY. CO.

### No. 6106.

Circuit Court of Appeals, Ninth Circuit.

Nov. 10, 1930.

M. W. Conkling, City Atty., and C. L. Byers, Asst. City Atty., both of San Diego, Cal., for appellant.

Robert Brennan, M. W. Reed, and E. T. Lucey, all of Los Angeles, Cal., for appellee.

Before RUDKIN and WILBUR, Circuit Judges, and NORCROSS, District Judge.

**12**

RUDKIN, Circuit Judge.

Upon the original submission of this case an opinion was prepared by Judge DIETRICH, but after his death the case was restored to the calendar for reargument and has been resubmitted to the court by stipulation of the parties. Upon full consideration the opinion of Judge DIETRICH, which follows, is adopted as the opinion of the court.

"By the decree below the appellant is enjoined from enforcing an assessment made by its officers upon property constituting a portion of appellee's terminal facilities in the city of San Diego, to cover the expense, in part, of opening a street in the vicinity thereof. The total cost of the proposed work was determined to be $54,565.83, of which $12,607.12 was assessed against appellee's property. The decree followed a finding that the projected improvement, if not detrimental, would at least be of no benefit to appellee.

"Appellee's depot and appurtenances are at the corner of Broadway and Kettner streets, with entrances from both streets. Broadway is a wide thoroughfare, running east and west, and easterly from the depot penetrates the main business section of the city. Kettner street, not so wide, extends indefinitely north and south at right angles with Broadway. North of appellee's premises, and approximately 600 feet from Broadway, is B street, which, in its easterly reaches, also passes through the main business section. It will thus be seen that appellee's station may be entered on the south side from Broadway and on the east side from Kettner street, which connects with Broadway and other east and west streets to the south and with B and other streets to the north. Immediately across Kettner street, east of appellee's grounds, lies a vacant block, bounded by B street on the north, Broadway on the south, and on the east by India street, which is parallel with and about 200 feet from Kettner street. Extending east from India street is C street, midway between and parallel with Broadway and B streets. The projected work contemplates the extension of this C street westerly from India street to Kettner, whereupon it will terminate directly in front of the easterly depot entrance. The expense is to be imposed under what is known as a local or district assessment plan. The improvement district established as the area to be assessed is a rectangular tract with the longer boundary lines thereof 90 feet on either side of the center line of C street, actual or projected, and extending in length from a line nine blocks easterly from India street to a line 225

feet west from the westerly line of Kettner street, thus including, of appellee's property, a tract 180 by 225 feet. By the city council the railway company's protest, on the ground that the assessment was unjust and arbitrary, was overruled. Whereupon this suit was instituted.

"That the court below did not err touching the general principles of law applicable in such a case is disclosed by the following excerpt from its well-considered opinion, 34 F.(2d) 293:

" 'The Street Improvement Act of the State of California, under which, it is asserted, the city proceeded (secs. 4, 5, p. 70, Stats. of Cal., 1889, and Amendatory Acts [Deering's Gen. Laws, 1923, Act 8195]), provides for the hearing of objections to the proposed work and to the assessments made, and declares that the decision of the City Council allowing or disallowing protests "shall be final and conclusive." It is admitted by defendants that the finality which attends the determination of the City Council when it acts upon the protest of a property owner assumes cases where that body acts within a fair and reasonable discretion upon the matter before it (which is presumed, prima facie), but that the protestant is not concluded if he is able to show that no fair rule of uniformity was adopted in making the assessment (Schaffer v. Smith, 169 Cal. 764, 147 P. 976), or that the assessment was made without regard to benefits to accrue to the property taxed (Spring Street Company v. City of Los Angeles, 170 Cal. 24, 148 P. 217, L. R. A. 1918E, 197).

" 'The question to be answered in such cases is: Did the municipal body use the judicial judgment which the law requires of it, and determine the amount of the assessments upon the basis of benefits to property assessed? Where it is plain that the Council, upon a showing of valid supporting facts, has ruled that benefits accrue to the property assessed to pay the cost of the work, that determination may not be overthrown by witnesses produced in court who testify that the assessment is for too large an amount. The law has established the agencies which shall settle the question of the amount of damages and benefits: first, the commissioners appointed for that purpose; second, the municipal Council, with full power to revise, correct and annul the commissioners' report. Counsel for defendants have cited a number of California decisions on the question, all showing the limited power which the courts have in these matters. There is no real dif-

3

ference between respective counsel as to the law.

"'An assessment of the kind here to be considered will be deemed arbitrary and illegal if, upon examination of the record of proceedings had, together with other evidence offered to show fully plain conditions which the assessing officers are presumed to have had before them, the conclusion is inescapable that the property assessed could not be benefited by the contemplated work, or that, if benefited, the benefit necessarily would be trivial or inconsequential. * * *

"'The State law authorizing the segregating of the property of a limited number of taxpayers within a district, and placing the cost of improvement work, the use of which will be equally shared in by the general public, as a charge upon the property within the district, rests, as the Supreme Court of California said in Spring Street Company v. City of Los Angeles, supra, upon the compensating benefit resulting to the included property as "its sole warrant."'

"Not only is appellee's property now devoted exclusively to railroad purposes, and so improved as to make wholly probable the permanency of such use, but by the deeds conveying title to its immediate predecessor in interest it was expressly provided that the grantee must construct and maintain thereon a passenger station, with reversion of title in case of failure to comply with this condition. We are, therefore, of the opinion that in making the assessment appellant was bound to assume the measurable permanency of such use and to make assessment accordingly. See Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226, 17 S. Ct. 581, 41 L. Ed. 979; City of Oakland v. Schenck, 197 Cal. 456, 241 P. 545; Southern Pac. R. Co. v. S. F. Savings Union, 146 Cal. 290, 79 P. 961, 70 L. R. A. 221, 106 Am. St. Rep. 36, 2 Ann. Cas. 962; Naugatuck R. Co. v. City of Waterbury, 78 Conn. 193, 61 A. 474; New York Bay R. Co. v. Newark, 82 N. J. Law, 591, 83 A. 962; In re East 136th Street, 127 App. Div. 672, 111 N. Y. S. 916; City of Barre v. Barre & Chelsea R. Co., 97 Vt. 398, 123 A. 427, 37 A. L. R. 207; Federal Construction Co. v. Ensign, 59 Cal. App. 200, 210 P. 536; Road Improvement Dist. No. 1 v. Missouri Pac. R. Co. (C. C. A.) 2 F.(2d) 340; Kimama Highway Dist. v. O. S. L. R. Co. (C. C. A.) 298 F. 431; Kankakee v. Illinois Cent. R. Co., 257 Ill. 298, 100 N. E. 996.

"In its discussion of the facts the lower court said:

"'The proposed opening of C street does not touch either side of the depot property. The depot now has access furnished on its southerly side from Broadway and along its easterly side from Kettner. Already B street, at the maximum of 300 feet from the easterly center line of the depot, furnishes a way for traffic to enter or depart to or from Kettner. The block lengths in the city are short, none exceeding 300 feet. It would seem to be beyond denial that if Kettner were a private way, and the railroad company were allowed the exclusive use of it as far as B street, for loading purposes, passenger and express, its interests would be advanced. Any condition which would divert general traffic, having no business at the depot of complainant, from Kettner, would facilitate the handling of the railroad business, both as to the railroad itself and the public who make use of its service. With as ample means of ingress and egress as could be desired already enjoyed by it, quite apparent it is that any change in conditions which will have the effect of increasing general traffic along the depot frontage on Kettner boulevard can be of no conceivable benefit to the railroad, but rather a detriment. The greater the general traffic the greater the obstruction to complainant's business. The opening of C street will not only bring into Kettner a new line of miscellaneous traffic, but will create a corner turning-point directly opposite that side of the depot used by cabs and vehicles brought there on business with the railroad. How this condition could result in advantage to complainant or enhance the value of the property for railroad uses cannot reasonably be explained. This conclusion results from a consideration of fixed conditions, all necessarily apparent, as a fact and by presumption, to the street-opening commissioners and to the municipal Council.'

"Upon an examination of the evidence we discover no reason for disturbing these findings and conclusions, and, therefore, the decree will be affirmed."

WILBUR, Circuit Judge (dissenting).

The property occupied by the Atchison, Topeka & Santa Fé Railway Company as depot ground is assessed for the opening of C street. This street abuts directly in front of the depot and will permit travel along said street to reach the depot grounds and to pass therefrom. These depot grounds were included by the city council of the city of San Diego in the assessment district upon the property in which, under the act of the Legislature, the

cost of the opening was to be assessed. Under the law an opportunity was given to the property owners to be heard upon the question as to whether or not their property included in the district would be benefited by the proposed improvement. The railway company exercised the right to be heard, therein accorded, and after such hearing its objection to the inclusion of the depot grounds in the assessment district was overruled by the city council. Thereafter, in conformity with the law, the cost of the opening of the street was assessed upon the property within the district, including the depot grounds of the appellee.

The trial judge held that the depot property of the appellee would be damaged by the opening of C street. The theory of the appellee's witnesses seemed to be that the division of the traffic directly in front of the depot, by turning into and from C street, would tend to interfere with the traffic along Kettner boulevard. The following testimony of Geo. L. Weiss, on behalf of the appellee, fairly indicates the attitude of the appellee, to wit:

" * * * That at the present time Kettner boulevard between Broadway and B street is dedicated to a width of 37½ feet; that a portion of the street is not improved, that is, it isn't paved; that the 37½ feet lying westerly of that is paved and is a portion of the Atchison Company's station grounds. The traffic on Kettner boulevard north and south which does not stop at the depot is quite heavy at the present time, averaging some 250 vehicles south during daylight hours and 190 on an average per hour north. Of this through traffic a small portion stops at the depot going in either direction. The parking that is done at the present time is largely south of the entrance to the depot, with some parking on the east side of the unimproved portion of the street east of the paving; that traffic coming from the north on Kettner boulevard stops, headed south, either at the depot or in the parking area; traffic coming from the south has the choice of different routes in approaching the depot. They could either approach on the east side of the street, and head in and park there, and cross the street to the depot, or they could go by way of Broadway, India and B street, or around the block, in order to approach the depot going south, or they could proceed north on Kettner boulevard to the intersection at B street and make a U turn, in order to be heading south to approach the depot on the depot side. * * *

"Q. By Mr. Reed: Are traffic conditions, through and local, similar, in the instance you have in mind, at Los Angeles to those at San Diego? A. In front of the depot they are.

"Q. Well, based on that experience and that observation that you have related, have you an opinion of what, if any, effect the opening of C street would have on traffic conditions on Kettner boulevard, in San Diego? A. In my opinion the opening of C street into Kettner boulevard would be a decided detriment to traffic conditions on Kettner boulevard.

"That the traffic moving north and south on Kettner boulevard would be interrupted by traffic moving in and out of C street. The bulk of the traffic is through traffic going to points south of the depot, south and east. The opening of C street into the middle of this block into the streams of traffic would create at that point a situation which is hazardous and far more congested than it is at the present time. It would tend to invite traffic from Kettner boulevard into C street, which in itself would be a detriment to the traffic. You would have crossing lines of traffic, that moving north and south on Kettner boulevard with that moving in and out of C street, or, rather, attempting to move in and out of C street, at a point where deliveries are being made, in the form of taxicabs and people stopping at the depot at the very center. And, further, there is congestion at various other points where a T intersection exists. The traffic coming into a main highway coming in from a side street into a street of similar width, carrying more traffic, creates more congestion at that point."

On the other hand, the appellant produced its street superintendent, who testified as to the general method used by the city officials in assessing benefits of street opening. He testified "that the benefits to be assessed are determined on the theory that the proposed opening will invite use and traffic and business to the property nearest the opening." He further testified, with reference to traffic conditions, as follows:

"That he is familiar with automobile and vehicle travel in the vicinity of Kettner boulevard and between Broadway and B street, and that he has made a study of traffic conditions which exist there; and that it has been his duty to maintain repairs to that street; and that it is his opinion that the opening of C street will decrease traffic congestion between Broadway and C, particularly the inbound, or southbound traffic; that at the

present time the paving on Kettner boulevard between Broadway and B street lies entirely on property owned by the Santa Fé, and there has been constructed in the unpaved portion of Kettner a landing place for street car passengers; and that automobiles that now drive to the Santa Fé station, coming from Broadway and turning north on Kettner, park between the edge of the paving, which is the east line of the Santa Fé property and this landing platform, the automobiles being headed northeasterly when so parked; that they are required to back out into the line of traffic of Kettner boulevard in order to get out of that parking space; that automobiles coming down to the station, in a southerly direction on Kettner, park across the street just east of the structure known as the Santa Fé depot; that with the balance of Kettner boulevard, from the end of the paving to the easterly line of Kettner boulevard, being paved, and the passenger-loading platform being removed, it is his opinion that the space for traffic, both moving and standing, would be increased at least seventy-five per cent. upon the opening of C street; that from his knowledge of the situation, and his study, it is his opinion that the opening of C street will relieve congestion of traffic in front of the Santa Fé Railway; that as superintendent of streets it was his duty to inspect and pass on assessments levied for benefits for public improvements in the City of San Diego, and that he is familiar with the assessment roll which was made up by the commissioners in the proceeding for the opening of C street; and that he passed on the assessment roll, checking the methods used to determine whether or not the said assessment was equitably proportioned; that he passed the said assessment roll as being a record of an assessment levied for benefits in equitable proportion to the benefits received for the proposed opening of C street; that his method of checking assessments in the first instance is to compare the assessment levied against one particular piece of property with a property lying in the same relative position from the improvement. In the case of an opening such as this one he compared the assessments on property lying along C street, and found after this comparison that the ratio increased in its proper proportion. For instance, he took as his unit in this case property lying between India and Columbia, and multiplied that figure by the ratio between the size of the Santa Fé property, and the ratio was exactly, or nearly enough so, in proportion between those two

properties and properties lying immediately east, to determine that it was a proper assessment. That in his opinion the amount assessed to the property lying west of Kettner within the proposed benefited district was assessed an amount that was reasonably in proportion to the benefits received."

Frank Simmonds, a real estate broker, testified that in his opinion the value of the depot grounds would be increased from $54,900 to $76,860 by the street opening, and stated the grounds of his opinion as follows:

"Well, in arriving at both of the values there are a great many factors that must be considered in establishing the value both at this time and the value that will be present after the opening; the sales prices of various properties in the district, the accessibility of the property as it now stands, and as it will be after the opening; the prominence of the property now and the added prominence that will be given by the opening of C street; the advertising feature that will be added to the property after the opening of C street; its accessibility, and the increase in the amount of light that will always be furnished to the property in case of improvement. We have a condition there now where this property covers, with the adjoining properties of the company, a very long block, with the only entrances being at the north and south ends of the block, facing a large property which is at this time unimproved, but which might be improved at some future date with a large building that would so obstruct the railroad company's property from any view from the east part of the city that it would almost be lost except from approaching it from the north or south or from the west of the property, which is a very short distance to the harbor. There would be very little approach to the property from the west. In other words, the opening of C street will forever insure this property of proper access from three streets instead of two, as now exists, and will also insure the property from ever being totally obscured by the erection of large buildings across the street. Those are all features which enter into the value of the property. They are determining factors which enter into the value of the property. For that reason it is my opinion that the value of the property after the opening will be increased by $21,960.

"That in his opinion the proposed opening of C street would invite more people, more traffic and more business to a point west on Kettner boulevard. That it certainly is a

theory of opening proceedings that benefits are determined to a large extent on the fact that such opening has a tendency to increase use of property lying nearest to the opening."

He also testified that in his opinion the property would be benefited even if it was permanently restricted to railroad uses.

John A. Thornton testified as to the use of the appellee's property as follows: " * * * that he had recently inspected the depot property of the Santa Fé in San Diego and found the ordinary railroad depot, conducting the business of a railroad, and, in addition, a restaurant conducted by the Fred Harvey Company, and a baggage room, and cigar counter, and newspaper stand, and an American Express Company stand, which conducts a business there, and several private transfer companies conducting their business there, also, a business of the sale of cigarettes, cigars and novelties, conducted in the news stand."

The foregoing testimony indicates that the effect upon traffic in the vicinity of the appellee's property is at the most a debatable one; that it is conceded that the street opening will tend to increase traffic in front of the appellee's property, and that under these circumstances the question of benefit is one properly to be determined by the officials charged with that duty, and that there is no basis for the interference of the court. As was said by the Supreme Court of California in Duncan v. Ramish, 142 Cal. 686, 76 P. 661: "The absence of benefit to the lot-owner cannot be a judicial question, unless the court can plainly see that there could be no benefit, and it is so clear that it does not admit of dispute by evidence; otherwise, the legislative decision is conclusive."

The appellee, in its attack upon the assessment, relies upon the special use to which the property is devoted to show that the property is not benefited. In this regard the complaint alleges "that complainant's said property, owing to its character and the use to which it is *exclusively and permanently devoted, will receive no benefit whatever from said improvement* and that said assessment against said property is confiscatory, fraudulent and illegal by reason of the matters hereinbefore alleged." (Italics ours.)

It is alleged and claimed that the enforcement of said assessment will deprive complainant of property without due process of law.

The majority opinion sustaining the trial court is based upon the special use to which appellee has devoted its property to sustain the view that the property is not benefited by the increased traffic which would result from the opening of C street. I think this view is erroneous. The statute of California authorizing local assessments for street opening, and other improvements, expressly authorizes and directs that the assessment be levied upon railroad property in the same manner as other property within the district is assessed. St. Cal. 1911, p. 730, 742, § 20, subd. 11. This statute, in view of the legislative and judicial history in such matters in California, I think, in effect directs the assessment officers to ignore the fact that the real estate is used for railroad purposes and to assess the property the same as other real estate similarly situated is assessed. See Cal. St. 1885, p. 147, § 7, subd. 11; St. 1911, p. 730, § 20, subd. 11; Street Opening Act of 1889, Cal. St. 1889, p. 70, § 9; Deering's Gen. Laws, Act 8194, § 7, subd. 11; Cal. St. 1903, p. 376, § 16 and § 33, subd. 8, amended, Cal. St. 1911, p. 855, also St. 1909, p. 1041; Los Angeles Pacific Co. v. Hubbard, 17 Cal. App. 651, 121 P. 306; Wilson v. Pac. Ry. Co., 176 Cal. 248, 168 P. 128; McNeil v. City of South Pasadena, 166 Cal. 153, 135 P. 32, 48 L. R. A. (N. S.) 138; Rutledge v. City of Eureka, 195 Cal. 404, 234 P. 82; Schaffer v. Smith, 169 Cal. 764, 147 P. 976; So. Cal. Ry. Co. v. Workman, 146 Cal. 80, 79 P. 586, 82 P. 79, 2 Ann. Cas. 583. This was done by the city authorities, according to their testimony. Such legislation seems to have been approved by our Supreme Court. In Louisville & N. R. Co. v. Barber Asphalt Co., 197 U. S. 434, 25 S. Ct. 466, 467, 49 L. Ed. 819, supra, with reference to the assessment of the railroad right of way for street improvement, it was contended that "the property involved is peculiar; belongs to a class by itself, is a railroad right of way and is not, in fact cannot be, benefited and hence should not be assessed." In replying to this argument the Supreme Court said:

"But in this case it is not necessary to stop with these general considerations. The plea plainly means that the improvement will not benefit the lot, because the lot is occupied for railroad purposes and will continue so to be occupied. Compare Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226, 257, 258, 17 S. Ct. 581, 41 L. Ed. 979, 992. That, apart from the specific use to which this land is devoted, land in a good-sized city generally will

get a benefit from having the streets about it paved, and that this benefit generally will be more than the cost, are propositions which, as we already have implied, a legislature is warranted in adopting. But, if so, we are of opinion that the legislature is warranted in going one step further and saying that on the question of benefit or no benefit the land shall be considered simply in its general relations and apart from its particular use. See Illinois C. R. Co. v. Decatur, 147 U. S. 190, 13 S. Ct. 293, 37 L. Ed. 132. On the question of benefits the present use is simply a prognostic, and the plea a prophecy. If an occupant could not escape by professing his desire for solitude and silence, the legislature may make a similar desire fortified by structures equally ineffective. It may say that it is enough that the land could be turned to purposes for which the paving would increase its value. Indeed, it is apparent that the prophecy in the answer cannot be regarded as absolute, even while the present use of the land continues; for no one can say that changes might not make a station desirable at this point; in which case the advantages of a paved street could not be denied. We are not called on to say that we think the assessment fair. But we are compelled to declare that it does not go beyond the bounds set by the 14th Amendment of the Constitution of the United States."

This view was again asserted in the later case of Branson v. Bush, 251 U. S. 182, 40 S. Ct. 113, 115, 64 L. Ed. 215, where the depot ground and railroad right of way were assessed ad valorem for certain street improvements. In reference to this assessment the Supreme Court said: "No attempt was made to prove fraudulent, or capricious or arbitrary action on the part of any officials in making the assessment, the only evidence upon the subject being the opinions of four employees of the company that the improvement of the road would not benefit the railroad property, and if inequality has resulted from the application of the state law in a customary manner to a situation frequently arising in our country, it is an incidental inequality resulting from a valid classification of railroad property for taxation purposes which does not fall within the scope of the Fourteenth Amendment, which 'was not intended to compel the states to adopt an iron rule of equal taxation' "—citing cases.

We have recently applied this rule as to the assessment of railroad property for street improvements in which we upheld the assess-ment of a railroad right of way in California for improvement of a road in the town of Larkspur. Northwestern Pac. Ry. Co. v. Town of Larkspur, 36 F.(2d) 554, 556. This court, speaking through Judge Rudkin, said: "But the constitutional rights of the appellant were not invaded unless the action of the city council in approving the assessment and apportioning the tax was arbitrary, wholly unwarranted, or a flagrant abuse of authority. Branson v. Bush, 251 U. S. 182, 40 S. Ct. 113, 64 L. Ed. 215. And the mere fact that an undue portion of the cost of some part of the improvement was assessed against the property of the appellant would not violate its constitutional rights, unless the assessment as a whole was arbitrary and discriminatory."

A similar conclusion was reached by the Supreme Court of Washington in the case of Seattle v. Seattle & Montana R. Co., 50 Wash. 132, 96 P. 958. The findings of the court in that case, set forth at page 135 of the opinion (96 P. 958), were to the effect that, while the lots were used for railway purposes, "the only use to which said lots and tracts are now adapted and the only use to which they will be permanently adapted while they continue in the condition now fixed by the improvements and expenditures heretofore found," it is found as a fact that while in that condition they were not benefited by the improvement for which they were assessed, but, if and when devoted to other uses than the uses hereinbefore found, they will be actually benefited to the amounts severally assessed to each thereof in the assessment roll. The assessment was affirmed. It should be noted that this was an appeal from a judgment confirming the assessment which under the law was a part of the statutory procedure for ascertaining the proper assessment. This decision was based on Northern Pac. Ry. Co. v. Seattle, 46 Wash. 674, 91 P. 244, 12 L. R. A. (N. S.) 121, 123 Am. St. Rep. 955. In that case, as quoted in 50 Wash. 136, 96 P. 958, 959, it was said: "Although the appellant may not hold the fee-simple title, there is no reasonable or immediate probability that it will abandon the land. Its use will doubtless be perpetual. Appellant is therefore for all practical purposes the substantial owner. The fee, subject to its use and easement, is of but little value, if any. Except for appellant's occupancy, no suggestion would be made that the land was not benefited by the improvement, or that it would not be subject to the assessment. The particular use of the

18

land cannot affect its liability to assessment. Abutting property cannot be relieved from the burden of a street assessment simply because its owner has seen fit to devote it to a use which may not be specially benefited by the local improvement. The benefit is presumed to inure, not to such present use, but to the property itself, affecting its value." To the same effect, see Heman Construction Co. v. Wabash R. Co., 206 Mo. 172, 104 S. W. 67, 12 L. R. A. (N. S.) 112, 121 Am. St. Rep. 649, 12 Ann. Cas. 630; Northern Indiana Ry. Co. v. Connelly, 10 Ohio St. 159; Wilson v. Pacific Ry. Co., 176 Cal. 248, 168 P. 128; McNeil v. City of So. Pasadena, 166 Cal. 153, 135 P. 32, 48 L. R. A. (N. S.) 138; Rutledge v. Eureka, 195 Cal. 404, 234 P. 82.

In the case at bar the attack on the assessment in question is not based upon unreasonable discrimination against the appellee's property as compared with other property similarly situated, but upon the alleged failure to discriminate in its favor because of the special use to which it is put. Ordinarily the question of benefits is one to be determined by the Legislature or by some subordinate authority, and its determination is conclusive on the courts unless palpably erroneous. In Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 66, 41 L. Ed. 369, that question was carefully considered by the Supreme Court, as follows:

"Assuming for the purpose of this objection that the owner of these lands had, by the provisions of the act, and before the lands were finally included in the district, an opportunity to be heard before a proper tribunal upon the question of benefits, we are of opinion that the decision of such a tribunal, in the absence of actual fraud and bad faith, would be, so far as this court is concerned, conclusive upon that question. It cannot be that upon a question of fact, of such a nature, this court has the power to review the decision of the state tribunal which has been pronounced under a statute providing for a hearing upon notice. The erroneous decision of such a question of fact violates no constitutional provision. The circuit court in this case has not assumed to undertake any such review of a question of fact. * * *

"We think this alleged difference is not material. It is in each case one of degree only, and the fact of the benefit is by the act to be determined after a hearing by the board of supervisors. In this case the board has necessarily decided that question in favor of the fact of benefits, by retaining the lands in the district. Unless this court is prepared to review all questions of fact of this nature decided by a state tribunal, where the claim is made that the judgment was without any evidence to support it, or was against the evidence, then we must be concluded by the judgment on such a question of fact, and treat the legal question as based upon the facts as found by the state board. Due process of law is not violated, and the equal protection of the laws is given, when the ordinary course is pursued in such proceedings for the assessment and collection of taxes that has been customarily followed in the state, and where the party who may subsequently be charged in his property has had a hearing, or an opportunity for one, provided by the statute. Kelly v. Pittsburgh, 104 U. S. 78 [26 L. Ed. 658]."

In that case it was claimed that some of the land in the district was already capable of beneficial use without irrigation, and that the additional benefit, if any, could not be considered for the purpose of assessment. The court on this proposition said: "In view of the finding of the board of supervisors on this question of benefits, assuming that there has been one, this court cannot say, as a matter of law, that the lands of the plaintiff in this case have not been, or cannot be, benefited by this proposed irrigation. There can be no doubt that the board of supervisors (if it have power to hear the question of benefits, as to which something will be said under another head of this discussion) would be a proper and sufficient tribunal to satisfy the constitutional requirement in such case. In speaking of a board of supervisors, Mr. Chief Justice Waite, in Spring Valley Water Works Co. v. Schottler, 110 U. S. 347, 354, 4 S. Ct. 48, 52 [28 L. Ed. 173], said: 'Like every other tribunal established by the legislature for such a purpose, their duties are judicial in their nature, and they are bound, in morals and in law, to exercise an honest judgment as to all matters submitted for their official determination. It is not to be presumed that they will act otherwise than according to this rule.'" See, also, Branson v. Bush, 251 U. S. 182, 40 S. Ct. 113, 115, 64 L. Ed. 215. This general rule as to the conclusiveness of the decisions of the state Legislature or its subordinate agencies to decide such questions of fact is not absolute and beyond the jurisdiction of the courts in all cases. It was plainly so stated in Fallbrook Irrigation District Co. v. Bradley, supra, where it was held (164 U. S. at page 170, 17 S. Ct. at page 67, 41 L. Ed. 369) that if

the decision of the taxing authorities "was actually opposed to all the evidence, and to the plain and uncontradicted facts of common knowledge, and was given in bad faith, in such case the decision would not have been the result of fair or honest, although grossly mistaken, judgment, but would be one based upon bad faith and fraud, and so could not be conculsive, in the nature of things."

In a number of recent cases the Supreme Court has amplified and enforced this rule concerning palpably erroneous conclusions of the state authorities. Myles Salt Co. v. Board of Comrs., 239 U. S. 478, 36 S. Ct. 204, 60 L. Ed. 392; Kansas City So. Ry. v. Road Imp. Dist., 266 U. S. 379, 45 S. Ct. 136, 69 L. Ed. 335; Road Imp. Dist. v. Mo. Pac. R. Co., 274 U. S. 188, 47 S. Ct. 563, 71 L. Ed. 992; Standard Pipe Line Co. v. Highway Dist., 277 U. S. 160, 48 S. Ct. 441, 72 L. Ed. 831, 58 A. L. R. 126; Miller & Lux, Inc., v. Sacramento, etc., Drainage Dist., 256 U. S. 129, 41 S. Ct. 404, 65 L. Ed. 859. In Branson v. Bush, supra, it said:

"The subject was carefully re-examined and the law restated in cases so recent as Wagner v. Baltimore, 239 U. S. 207, 36 S. Ct. 66, 60 L. Ed. 230, and Houck v. Little River Drainage Dist., 239 U. S. 254, 36 S. Ct. 58, 60 L. Ed. 266, with the result that the rule as we have stated it was approved, with the qualification, which was before implied, that the legislative determination can be assailed under the Fourteenth Amendment only where the legislative action is 'arbitrary, wholly unwarranted,' 'a flagrant abuse, and by reason of its arbitrary character a confiscation of particular property.' And see Withnell v. Ruecking Const. Co., 249 U. S. 63, 69, 39 S. Ct. 200, 63 L. Ed. 479; Hancock v. Muskogee, 250 U. S. 454, 457, 39 S. Ct. 528, 63 L. Ed. 1081; Embree v. Kansas City Road Dist., 240 U. S. 242, 250, 36 S. Ct. 317, 60 L. Ed. 624.

"The decisions relied upon by the company (Norwood v. Baker, 172 U. S. 269, 19 S. Ct. 187, 43 L. Ed. 443; Myles Salt Co. v. Iberia Drainage Dist., 239 U. S. 478, 36 S. Ct. 204, 60 L. Ed. 392, L. R. A. 1918E, 190; Gast Realty Co. v. Schneider Granite Co., 240 U. S. 55, 36 S. Ct. 254, 60 L. Ed. 523) are not in conflict with the rule but plainly fall within, and are illustrations of, the qualification of it."

See, also, Oregon Short Line R. Co. v. Clark County Highway Dist. (D. C.) 22 F. (2d) 681.

In my judgment the assessment under attack in the case at bar does not come within the exception to the general rule laid down by the Supreme Court. The judgment should be reversed.