**MAYFLOWER HOTEL STOCKHOLDERS
PROTECTIVE COMMITTEE et al. v.
MAYFLOWER HOTEL CORP. et al.**

No. 10745.

United States Court of Appeals
District of Columbia Circuit.

Argued March 26, 1951.

Decided June 25, 1951.

Argued On Rehearing Oct. 25, 1951.

Decided Nov. 29, 1951.

Messrs. D. Worth Clark and Leslie C. Garnett, with whom Messrs. John Lewis Smith, Samuel F. Beach, John Lewis Smith, Jr., Edgar J. Goodrich and Jerome J. Dick were on the brief, for appellants.

Mr. Claude A. Roth, of the Bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, and Mr. Roger J. Whiteford, with whom Mr. John J. Wilson was on the brief, for appellees Hilton Hotels Corporation, Joseph P. Binns, Harry L. Ludwig and William J. Friedman. Mr. Jo V. Morgan Jr., also entered an appearance for these appellees.

Mr. Edmund L. Jones, with whom Messrs. Nelson T. Hartson and William B. Harvey were on the brief, for appellees Mayflower Hotel Corporation, John Clifford Folger, John Stewart, Robert V. Fleming and Thornton Rancy.

Before WILBUR K. MILLER, PRETTYMAN and FAHY, Circuit Judges.

FAHY, Circuit Judge.

Certain minority stockholders of the Mayflower Hotel Corporation, a Delaware corporation (referred to in this opinion as Mayflower), filed an action in the District Court against Mayflower, Hilton Hotels Corporation (referred to as Hilton), and certain officers of these and other corporations involved in transactions attacked as illegal. The case was before this court in Mayflower Hotel Stock. P. C. v. Mayflower Hotel Corp., 1949, 84 U.S.App.D.C. 275, 173 F.2d 416, where we reversed a judgment which had dismissed the amended complaint for failure to state a cause of action. On remand, answers were filed, trial was had, findings of fact and conclusions of law were made, and final judgment was entered for defendants. Plaintiffs appeal again. The relief they seek is primarily with respect to (1) the acquisition by Hilton of the majority stock of Mayflower, alleged to have been accomplished in a manner violative of the rights of that corporation and of its stockholders; (2) a management contract between the two hotel corporations by which Hilton was engaged to manage the Mayflower hotel; and (3) commissions and bonuses paid by

Mayflower to defendant Folger, Nolan, Incorporated, in connection with (a) the purchase of Mayflower bonds to meet its sinking fund requirements and (b) refinancing of a Mayflower indebtedness of $1,700,000.

From this brief statement it is seen that the action involves to some extent the internal affairs of a foreign corporation. In such circumstances the courts of another jurisdiction will not ordinarily interfere. Rogers v. Guaranty Trust Co., 1933, 288 U.S. 123, 130, 53 S.Ct. 295, 77 L.Ed. 652; Beasley v. Mutual Housing Co., 1930, 59 App.D.C. 245, 39 F.2d 290; Maccarone v. Big Sign Shop, 1930, 59 App.D.C. 345, 41 F.2d 567; Fletcher Cyclopedia Corporations, Vol. 17, § 8425, p. 367. But there is a discretion; Rogers v. Guaranty Trust Co., supra; Williams v. Green Bay & W. R. Co., 1946, 326 U.S. 549, 556–557, 66 S.Ct. 284, 91 L.Ed. 311; Koster v. (American) Lumbermens Mutual Co., 1947, 330 U.S. 518, 528, 67 S.Ct. 828, 91 L.Ed. 1067; Restatement, Conflict of Laws, Topic 5, p. 279; Fletcher Cyclopedia Corporations, Vol. 17, §§ 8427, 8444, pp. 375, 413; and we construe this court's action in deciding the merits of the prior appeal as a proper exercise of discretion to entertain the case in this jurisdiction.

1. *The purchase by Hilton of the majority common stock of Mayflower.*

It is urged that Hilton acquired a majority of the common stock of Mayflower by a conspiracy among officers of Mayflower and the owners of a majority of its stock to secure for Hilton control of Mayflower to the detriment of its minority stockholders. It is asserted that the stock was sold to Hilton at a price substantially lower than could have been obtained, that the sale was secret, and that there were verbal conditions of which the minority were not informed. In passing upon such questions courts will ordinarily apply the law of the state of incorporation. Rogers v. Guaranty Trust Co., supra, 288 U.S. at page 130, 53 S.Ct. 295 (on this point the dissent of JJ. Stone and Brandeis, and that of J. Cardozo, do not appear to differ; see 288 U.S. at pages 148–149, 53 S.Ct. 295); Williams v. Green Bay & W. R. Co., supra,

326 U.S. at page 553, 66 S.Ct. 284; Zahn v. Transamerica Corp., 3 Cir., 1947, 162 F.2d 36, 40, 172 A.L.R. 495; Geller v. Transamerica Corp., D.C.Del. 1943, 53 F.Supp. 625, 629, footnote 7, *affirmed per curiam*, 3 Cir., 1945, 151 F.2d 534; Restatement, Conflict of Laws, §§ 197, 199, pp. 283–4; cf. Moran v. Harrison, 1937, 67 App.D.C. 237, 240, 91 F.2d 310, 313; Armstrong v. U. S. Building Ass'n, 1899, 15 App. D.C. 1, 18. In the prior opinion of this court, however, reliance was primarily placed upon Supreme Court decisions which either arose under federal statutes or were diversity jurisdiction cases decided according to federal law prior to Erie R. Co. v. Thompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. We accordingly construe our prior opinion as an application of the District of Columbia law. Further, we apply the rule that "The first decision has become the settled law of the case." Thompson v. Maxwell Land Grant Co., 1897, 168 U.S. 451, 456, 18 S.Ct. 121, 123, 42 L.Ed. 539. See, also, Clark v. Keith, 1882, 106 U.S. 464, 1 S.Ct. 568, 27 L.Ed. 302; Barney v. Winona & St. Peter R. Co., 1886, 117 U.S. 228, 231, 6 S.Ct. 654, 29 L.Ed. 858; In re Sanford Fork & Tool Co., 1895, 160 U.S. 247, 259, 16 S.Ct. 291, 40 L.Ed. 414. This court has, in the past, felt itself bound by such a rule. Washington Post Co. v. Chaloner, 1917, 47 App. D.C. 66, 71, *reversed on other grounds*, 1919, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987. We recognize that "the law of the case" is not to be construed as a limitation upon the power of a court to reconsider on a second appeal matters determined on a first appeal, but is merely an expression of a practice. Messenger v. Anderson, 1912, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152; see, also, Insurance Group v. Denver & R. G. W. R. Co., 1947, 329 U.S. 607, 612, 67 S.Ct. 583, 91 L.Ed. 547. This court has nevertheless stated that it will disregard the rule only when "a clear case * * * [is] * * * presented showing that the earlier adjudication was plainly wrong and that application of the rule would work manifest injustice, * * *." Brown v. Gesellschaft Fur Drahtlose Tel., M. B. H., 1939, 70 App.D.C. 94, 95, 104 F.2d 227, 228. In any event, the law of Delaware would require no different result.

The shares of stock involved in the questioned sale were owned by Donner Corporation and the defendant John C. Folger in respective amounts which will appear. The defendant John Stewart, who participated in the negotiations in behalf of Donner Corporation, was a director of Mayflower as well as president of Donner. Defendant C. Kenneth Baxter, who also acted for Donner, was a director of Mayflower. The defendant Folger was the president and a director of Mayflower. Donner held 194,525 shares and Folger 5,300 shares, their sum constituting a majority of the stock. In these circumstances some of the standards applicable to fiduciary relationships apply to the sale. Twin-Lick Oil Co. v. Marbury, 1875, 91 U.S. 587, 588; 23 L.Ed. 328; Southern Pacific Co. v. Bogert, 1919, 250 U.S. 483, 492, 39 S.Ct. 533, 63 L.Ed. 1099. See, also, Jackson v. Ludeling, 1874, 21 Wall. (88 U.S.) 616, 624, 22 L.Ed. 492; Pepper v. Litton, 1939, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281.

As recently stated by the Supreme Court in Securities and Exchange Comm. v. Chenery Corp., 1943, 318 U.S. 80, 85–86, 63 S.Ct. 454, 87 L.Ed. 626, to say that one is a fiduciary only begins analysis; but, as we held on the prior appeal, one of the consequences in circumstances like the present is that the majority stockholders, "upon whom the minority is dependent for knowledge, must make full disclosure when selling stock control", citing Sautter v. Fulmer, 1932, 258 N.Y. 107, 179 N.E. 310. Mayflower Hotel Stock. P. C. v. Mayflower Hotel Corp., 84 U.S. App.D.C. at page 282, 173 F.2d at page 423. Fletcher Cyclopedia Corporations, Vol. 13, § 5845, p. 187, was quoted as follows: "A secret and unfair sale of controlling stock may be redressed by suit of the minority." Fletcher, at the point indicated, cites for support:

"Secretly selling controlling shares above par while urging others to sell at par shows fraud. McManus v. Durant, 168 App.Div. 643, 154 N.Y.S. 580.

"Where majority stockholders, in violation of fiduciary duties owing the minority, secure the minority stock on the false representation that a third party has offered a certain price for the company's stock, and then sell their own stock to such purchaser for more than three times as much, the fact that the sale of the majority stock was attended by certain covenants on the majority stockholders' part of doubtful and unascertainable value, does not relieve them of the duty of accounting. Sautter v. Fulmer, 258 N.Y. 107, 179 N.E. 310."

Thus the secrecy which condemns such a sale is the secrecy of its terms and conditions, not the fact that a sale is to be effected. Hence failure to give prior advice to the minority is not itself a violation of a fiduciary responsibility owed by the majority stockholders. Nevertheless the sale must be shown to have been fair, free of secret or undisclosed arrangements as to price or other considerations different from the terms subsequently made known to all stockholders, and entirely in good faith.

The testimony regarding the sale led the trial court to conclude that it "was lawfully made and violated no rights of the minority stockholders of Mayflower." None of the officers or representatives of Hilton was connected with Mayflower or with the selling stockholders of that corporation. The defendant John P. Binns, who actively participated in the negotiations on behalf of Hilton, had been a director of Mayflower, but his resignation had been accepted October 22, 1945. The negotiations began in September 1946, and the sale was concluded in December. Binns then had been associated with Hilton for about a year, becoming one of its vice-presidents upon its formation about May 1946. While, therefore, no fiduciary relationship existed between the individual participants in the sale, nevertheless the relationship between the Donner interests and Folger, on the one hand, and the minority stockholders of Mayflower, on the other, was such as to make applicable the standards of a fiduciary relationship to which we refer in the paragraph just above. The same is true with respect to the relationship between Folger, Stewart and Baxter as officers and directors of Mayflower, on the one hand, and the stockholders of Mayflower, on the other.

We have carefully reviewed the evidence in the light of this situation and of the law applicable thereto. The price of $13 per share was above the market price. It was arrived at in good faith bargaining. It was the true and full consideration paid. There was a verbal agreement, if it can be so termed, that the same treasurer of Mayflower should be retained, but this was not significant; it was in the nature of a granted request for thoughtful consideration of the person affected and nothing more. Hilton promptly offered, at the insistence of Folger, to buy the stock held by the minority at the same price paid to Donner and to Folger. There was an understanding that control and operation of Mayflower would immediately be turned over to Hilton, but this lay within Hilton's power in any event and was not the sort of agreement, in addition to the price, as affects the validity of the sale. We think the court was not in error in finding that there was no other consideration than $13 per share.

There had been a tentative earlier offer, not by Hilton, to purchase the Donner stock at a higher price; but this was when the market price also was higher. This offer was at a point or two above the then market, which brought it to about $17.50 per share at that time. But the Donner interests were not then in the market to sell. Before they actually sold, the securities market had gone down, and with it the price of Mayflower stock. The sale made was at about the same point above the market as had brought the previous offer to $17.50. Several factors had intervened to cause the decline, including a 21 day strike at the hotel and an anticipated falling off in the hotel business. There was also evidence of previous offers to buy the physical property at prices indicating that the stock was worth more than $13 a share; but these did not mature and furnish no basis for upsetting the sale which was actually made.

We are of the opinion the findings and conclusions of the trial judge regarding the sale are justified. In so holding we are conscious that where a fiduciary obligation is involved the support for such findings

must be quite clear, and that the burden rests upon the fiduciaries to establish the entire fairness of the transaction.

### 2. The management contract.

Shortly after Hilton acquired the majority stock it entered into a contract with Mayflower for the management of the Mayflower hotel. Appellants seek to set aside this contract as a fraud upon them. It is dated January 2, 1947, was approved by the Mayflower Board January 27, 1947, and was retroactive to the first of the year. It is to continue for five years, subject during that period to termination for reasonable cause, as defined, upon written notice. The new directors of the Mayflower Board, placed there by Hilton, refrained from voting when the Board approved the contract. Nevertheless the fact is, as recognized by the trial judge, that Hilton, which was then the majority stockholder of Mayflower, sat on both sides of the table for all practical purposes. While this does not render the contract illegal *per se* it brings it under careful scrutiny. Mayflower Hotel Stock. P. C. v. Mayflower Hotel Corp., 84 U.S.App.D.C. at pages 280, 282, 173 F.2d at pages 421, 423; Pepper v. Litton, 1939, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281; Southern Pacific Co. v. Bogert, 1919, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099. The burden is upon such a stockholder, as it is upon the director, to prove not only the "good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." Pepper v. Litton, supra, 308 U.S. at page 306, 60 S.Ct. at page 245. The effect of failure to meet the burden, as illustrated by the Pepper case, is to deny recovery to the majority stockholder of his claims against the corporation based upon the transactions; similarly, when he has already received payment,

an action for an accounting will lie. Southern Pacific Co. v. Bogert, supra; Mayflower Hotel Stock. P. C. v. Mayflower Hotel Corp., supra.

Since the management contract is also one between corporations with interlocking directorates, a concurrent ground exists for requiring that the provisions must meet the high standards applicable to such a situation.[1] As stated by this court in its prior decision, quoting from Garrett v. Reid-Cashion Land & Cattle Co., 34 Ariz. 245, 270 P. 1044, 1052:

" 'Transactions by interlocking directorates with trust property afford such great opportunity and temptation for misuse or perversion of power by the trustees that the courts have thought fit to promulgate the rule of placing upon them the burden of proof to show "entire fairness; and, where a sale is involved, the full adequacy of the consideration." ' " 84 U.S.App.D.C. at pages 281–2, 173 F.2d at pages 422–423.

In Corsicana National Bank v. Johnson, 1919, 251 U.S. 68, 90, 40 S.Ct. 82, 91, 64 L.Ed. 141, the effect of this fiduciary obligation on the part of the common directors was to render the contract there in issue "presumptively fraudulent" and "voidable by the stockholders." Whether such a contract was also voidable in an action brought by the minority stockholders remained undecided. That question was squarely presented to the Court three years later in Geddes v. Anaconda Copper Mining Co., 1921, 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425, a decision which extended the rule by stating that "where the fairness of such transactions [between corporations having common members on their boards] is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration."[2] Such a burden was upon the

1. If there is any variance between Delaware and District of Columbia law in regard to the fiduciary relationship of a majority or controlling stockholder, it is an immaterial one in this case since the law of Delaware and the District of Columbia is in substantial accord regarding transactions between corporations

with interlocking directorates. See footnote 2, infra.

2. That Delaware law runs parallel to these principles is shown by Keenan v. Eshleman, 1938, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227, a case arising upon similar facts as the Geddes case and with the same result.

defendants in the instant case to show the "entire fairness" of the management contract and "the full adequacy of the consideration" given to Mayflower by its terms.

Much evidence was presented regarding the management contract. Principally, it brings into the management of Mayflower the Hilton staff of specialists in the operation of hotels, especially on a group basis. Hilton operates a considerable number of hotels throughout the country. It does national advertising, promotes interchange of guests, buys for its enterprises on a larger scale than is possible for hotels individually, and makes available expert advice in numerous and important phases of hotel management. For these and other management services the contract calls for payment of 1% of gross sales of Mayflower and 10% of gross operating profits in excess of $1,000,000, the maximum compensation, however, not to exceed $100,000 per annum. The services have been rendered and payments made, ranging from $69,156.08 in 1947 to $78,-172.33 in 1949, based on 1% of gross sales. Operating profits in excess of $1,000,000 have not been realized, so that the 10% provision has not affected the compensation.

Salaries previously paid to officers and directors of Mayflower in the aggregate sum of $28,000 per annum were discontinued; and the evidence was clearly to the effect that the 1% compensation to Hilton is reasonable. Comparison was made, for example, with the contract which had court approval in the Mayflower reorganization proceedings in 1935, under which the American Security & Trust Company was compensated at the rate of 1½% of gross income for services of a more limited character; also considered was a contract of the Statler Hotel Corporation to manage the William Penn Hotel in Pittsburgh, with 2% of gross sales as the compensation to Statler. Pertinent too are actual operations under the contract. We have carefully considered the evidence in this regard, showing increases in the business of various facilities, repairs and improvements made, utilization of space, overall financial situation, and dividends paid to stockholders. We realize that other factors than the management contract might well have played a part in all this, yet the situation which has transpired tends appreciably to support the fairness and beneficial effect of the basic provisions of the contract, namely, the provisions for management at a compensation of 1% of gross sales. We accordingly agree with the District Court insofar as his findings and opinion uphold the contract in these basic respects.

There are, however, other provisions of the contract in a different situation: (1) The provision for payment of 10% of gross operating profits in excess of $1,000,000 is not shown by the evidence either to be usual in the trade or to conform with the rigid standards of fairness applicable to this case. Very little evidence was devoted to this provision. Some doubt about it was raised by a special committee of the Mayflower Board which considered the question of continuing the contract in 1947. Notwithstanding there was considerable testimony as to the fairness of the contract in general, we think the circumstances require that each important provision be shown to be fair, or at least that when witnesses testify to the general fairness of the contract it must appear their attention had been devoted to each such provision. This does not appear. Insofar, therefore, as the trial court approved this provision we think its findings and conclusion are clearly erroneous. The burden upon defendants to prove the fairness of the contract in this respect was not met. (2) The provisions for arbitration are in like situation. One of the most competent witnesses for the defense refused to characterize them as fair. Such slight evidence as supports them does not reach the degree of certitude required in the circumstances. The arbitration provisions affect the question of "reasonable cause" for termination of the contract on the ground of failure by Hilton to observe any material term, or for violation of any duty or obligation owing to Mayflower under the contract. Hilton is given the right to have the question of reasonable cause arbitrated, each party, Mayflower and Hilton, to appoint

one arbitrator, the two thus appointed to select a third. Should they fail to agree upon such third arbitrator he shall be designated by a federal judge as provided in the contract. The decision of the arbitrators shall be conclusive and not subject to review by any court. In view of the fact that these provisions in all substance place the selection of at least two of the three arbitrators in the hands of Hilton, which controls the Mayflower Board, the evidence falls far short of demonstrating the fairness of this arrangement. (3) One further provision is not shown on the record to have the fairness required in the circumstances of this case, namely, the provision that all room, food, beverage, laundry, and valet expenses of Hilton employees while in Washington attending to the affairs of Mayflower shall be paid by the latter. Whether or not this payment, in addition to the 1% of gross sales, is fair is in no way touched upon in the evidence. Here, as in the case of the 10% compensation and the arbitration provisions, the burden of demonstrating the fairness of this provision was not met by the defendants. They may not rest merely upon evidence of a general nature regarding the contract, directed primarily to defense of the 1% compensation for the management's services required.

We think it is within the equitable powers of the court to consider these three provisions severable if Hilton, for whose benefit they must be assumed to have been inserted, is willing to continue under the contract without them.[3] Accordingly, on this branch of the case, we hold that the evidence supports the validity of the contract in all other respects, and that if Hilton consents to the elimination of these three provisions, and appropriate advice to that effect is placed in the record in the District Court, the contract is upheld; otherwise, the contract will be set aside.

*3(a). The commissions received by Folger, Nolan, Incorporated, in connection with the purchase of Mayflower bonds for retirement.*

The trial court found that in 1936 the Board of Directors of Mayflower authorized its president to appoint an agent to purchase in the open market Mayflower bonds so as to retire its bonded indebtedness in accordance with the trust indenture upon the property, requiring the use of 25% of annual net income for such retirement, either by cash payments to the trustee or by bond purchases. The findings in this regard are not in dispute. Nor is there dispute concerning the other facts as to this part of the case. These are that the president appointed Folger, Nolan, Incorporated, as the sinking fund agent for an agreed commission of $7.50 per $1,000 bond. From 1936 to 1943 this agent purchased bonds as authorized in the sum of $1,964,190, for $1,804,946.05, and received commissions of approximately $14,000. It is claimed that Folger, Nolan, Incorporated,[4] should be required to account for the commissions because Folger himself, who owned 80% of the stock of Folger,

---

3. Central Ky. Natural Gas Co. v. Railroad Commission, 1933, 290 U.S. 264, 271, 54 S.Ct. 154, 78 L.Ed. 307; Alexander v. Hillman, 1935, 296 U.S. 222, 239, 56 S. Ct. 204, 80 L.Ed. 192; Rogers v. Hill, 1933, 289 U.S. 582, 53 S.Ct. 731, 77 L. Ed. 1385; Bowen v. Hockley, 4 Cir., 1934, 71 F.2d 781, 786, 94 A.L.R. 856; Gulf, M. & N. R. Co. v. Illinois Cent. R. Co., D.C.E.D.Tenn.1937, 21 F.Supp. 282, 295, appeal dismissed by stipulation of the parties, 6 Cir., 1940, 109 F.2d 1016. Furthermore, even a court bound by the strict rules of the common law might well consider these particular provisions separate and divisible parts of a single contract. 6 Williston on Contracts § 1779 (Rev.Ed.); see, e.g., Paramount

Famous Lasky Corp. v. Nat. Theatre Corp., 4 Cir., 1931, 49 F.2d 64; McCullough v. Clinch-Mitchell Const. Co., 8 Cir., 1934, 71 F.2d 17, certiorari denied, 1934, 293 U.S. 582, 55 S.Ct. 96, 79 L.Ed. 678; Moffat Tunnel Improvement Dist. v. Denver & S. L. Ry. Co., 10 Cir., 1930, 45 F.2d 15, certiorari denied, 1930, 283 U.S. 837, 51 S.Ct. 485, 75 L.Ed. 1448; cf. Churchill Tabernacle v. Federal Communications Comm., 1947, 81 U.S.App. D.C. 411, 414, 160 F.2d 244, 247.

4. Mr. Folger acted through Folger, Nolan, Incorporated, in this matter. No point is made by the parties turning upon any distinction between Mr. Folger and Folger, Nolan, Incorporated, and we make none.

Nolan, Incorporated, and was its president, was a director of Mayflower and, in 1945, became its president.[5]

As shown by its minutes the Mayflower Board knew Folger had been appointed sinking fund agent. He made reports of progress, explained the problems, and there were full discussions, covering, *inter alia,* the question of compensation. In the minutes of April 21, 1938, for example, occurs the following: "Following Mr. Folger's discussion, Mr. Baxter expressed the opinion that the manner of purchasing the bonds was sound, and compensation fair, in view of the existing conditions. He stated that in operations in unlisted bonds with which he was familiar, charges varied from ¼ of a point to several points, depending upon the amount of work involved."

▪ The court is required to scrutinize this arrangement with the greatest care to test its eminent fairness. As we have said, Folger was a director of Mayflower, at times its president. Mr. Baxter, a director, was also closely associated with the Donner interests which, as has been seen, held approximately half of the Mayflower stock. While the charter of Mayflower authorizes an officer or director to contract with the corporation for his own benefit, upon full disclosure of his interest, this we think is immaterial in considering the legality of the transaction from the standpoint of fairness. If under the applicable principles the arrangements are found wanting, the charter provision referred to is unavailing to supply the want.

▪ The relationship which, as we have seen, a director occupies toward the corporation and its stockholders, does not preclude all contracts between a director and his corporation. See Twin-Lick Oil Co. v. Marbury, 1875, 91 U.S. 587, cited in Mayflower Hotel Stock. P. C. v. Mayflower Hotel Corp., 84 U.S.App.D.C. at page 278, 173 F.2d at page 419. But such contracts will be "looked upon with suspicion," McGourkey v. Toledo & Ohio Railway, 1892, 146 U.S. 536, 565, 13 S.Ct. 170, 36 L.Ed. 1079; they "may be set aside on slight grounds," Twin-Lick Oil Co. v. Marbury, supra, 91 U.S. at pages 588–589, as where the director profits at the expense of the corporation, Wardell v. Railroad Co., 1880, 103 U.S. 651, 658, 26 L.Ed. 509. As in the instance of interlocking directorates, *supra,* also involved in the sinking fund arrangements, the burden of proof falls upon the director to show "the fairness of the transaction by clear and satisfactory evidence." Mayflower Hotel Stock. P. C. v. Mayflower Hotel Corp., 84 U.S.App.D.C. at page 280, 173 F.2d at page 421; Geddes v. Anaconda Copper Mining Co., supra, 254 U.S. at page 599, 41 S.Ct. 209, 65 L.Ed. 425.[6]

It appears that while purchasing bonds under the sinking fund arrangements Mr. Folger made purchases for the Donner interests of Mayflower stock incident to the bond purchases. The stock certificates were attached to the bonds during part of the time the bonds were being purchased, and the Donner interests took the stock.

▪ It is stipulated by the parties that the commissions paid Folger, Nolan, Incorporated, by Mayflower, namely, $7.50 per $1,000, were usual and customary in the District of Columbia at the material times, and the court below found that they were

---

5. He resigned as president in connection with the Hilton acquisition of control but remained upon the Board.

6. Similarly, under Delaware decisions, "They [directors] have no right to compensation for services rendered outside their duties as directors unless there had been an express contract to pay for such services, or, as some cases hold, unless the services were clearly outside their duties as directors and performed under circumstances sufficient to show that it was understood by the proper officers, as well as the directors claiming compensation, that the services were to be paid for by the corporation." Lofland v. Cahall, 1922, 13 Del.Ch. 384, 118 A. 1, 3. The Delaware Supreme Court has also stated that in such situations the burden to show fairness and an absence of fraud or overreaching rests with the director. Guth v. Loft, Inc., 1939, 23 Del.Ch. 255, 5 A.2d 503, 512; Keenan v. Eshleman, 1938, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227, 232.

fair and reasonable. We are of the view that Mr. Folger was not by virtue of his position on the Board required to carry on these operations without compensation in addition to his pay as a director or officer, and a majority of the court agree that the amount received by him from Mayflower was fair and reasonable and that the holding of the court below that these and the other transactions between Mayflower and Folger, Nolan, Incorporated, were lawful should not be disturbed.[7]

3(b). *The commission paid in connection with refinancing of loan.*

 The facts in this regard, as found by the District Court, correctly we believe, are: Folger, Nolan, Incorporated, offered to refinance the Mayflower first mortgage indebtedness by the purchase of the corporation's new unsecured promissory notes in the total sum of $1,700,000, said notes to bear interest at the rate of 2⅝%. Folger, Nolan, Incorporated, offered to pay $1,683,000 for said notes. The then outstanding indebtedness of Mayflower was secured by a first mortgage indebtedness on the hotel property bearing interest at the rate of 3½% per annum. The Folger corporation in its offer proposed to sell the new notes to various local banks. The offer was accepted, and over a period of some months the transaction was completed. Six Washington banks and one Baltimore bank purchased the entire issue of $1,700,000 of new notes at par, and with the proceeds the mortgage indebtedness of $1,700,000 was liquidated. It will be seen that in essence what occurred was that the mortgage indebtedness of $1,700,-000 bearing interest at 3½% per annum

was paid off and in its place there was substituted an unsecured indebtedness of like amount bearing interest at the rate of 2⅝% per annum. The Folger corporation managed this matter at a profit to itself of $17,000; that is, it paid Mayflower $1,-683,000 for new notes of $1,700,000 which were taken by the banks at the latter figure. It was stipulated by the parties that this $17,000 was the customary profit on such transactions in the District of Columbia at the time, and the court below found it to have been fair and reasonable. There is no basis upon which to disturb this decision of the trial court. Clearly the handling of this matter was not within the ordinary scope of Mr. Folger's responsibilities as director. Clearly also the record shows the transaction to have been beneficial to the corporation. Since there was no bar to the handling of it by Mr. Folger himself or through Folger, Nolan, Incorporated, provided in all respects the fiduciary standards applicable to the situation were met, as we agree was done, we approve the disposition of this aspect of the case made by the trial court.

We have examined all other matters submitted on the appeal and find no reason to disagree with their disposition by the District Court or to treat them separately in this opinion.

In summary, we affirm the judgment below except as to the three provisions in the management contract the validity of which we hold has not been sustained. If Hilton does not desire to continue under the management contract with the deletion of the three provisions we have not approved, the entire contract will be set aside and an accounting required for the amounts paid

---

7. Although the point is not urged by appellants, the writer of this opinion is unable to approve a charge by Mr. Folger to Mayflower for what was in part done for the Donner interests. He is of the view that in those transactions which were in part for the benefit of another, some part of the commission should have been charged to the other. Although the amount involved is relatively small, the scrupulous manner in which such transactions must be appraised requires the court, he believes, to remand this aspect of the case for an adjustment of the commissions by deducting from the amounts charged to Mayflower a fair charge for the benefit which inured to the Donner interests, this charge to be refunded to Mayflower. The writer is also of the view that though otherwise fair and reasonable, the commissions paid by Mayflower on bond purchases should be refunded to the extent they exceeded charges for like services to the Donner interests. In the circumstances the writer feels that Mayflower should have the benefit of any lower commissions charged by Mr. Folger for like services to others.

under it. This accounting will be without prejudice to any claim which might be asserted by Hilton for services rendered. We do not now pass on the question of the right to or amount of compensation for such services.

Affirmed in part, modified in part, and remanded for such further proceedings as may be required consistently with this opinion.

## On Rehearing.

Appellants moved for clarification of our opinion of June 25, 1951, that an accounting be required as to sums involved in our holding that several provisions of the management contract were invalid, and for award of costs to appellants. Without ruling on the motion we entered judgment, affirming in part and modifying in part the judgment of the District Court, and remanding the case to that court for proceedings consistent with our opinion. We also ordered that each party bear the cost of printing his or their briefs, and that the clerk's fees and costs and the cost of printing the joint appendix should be divided equally between appellants and appellees. Judge MILLER did not concur in the disposition made of the costs problem.

The motion of appellants was answered by Hilton, Mayflower, and other appellees. Aside from the matter of costs and accounting, the questions raised concern the validity of that part of the compensation provisions of the management contract which call for payment to Hilton of 10% of gross operating profits in excess of $1,000,000. It was pointed out in the motion papers, correctly, that the statement in the opinion that this provision had not come into operation because operating profits had not exceeded $1,000,000 in any year, was in error, as was the statement that some doubt about the provision had been raised by a special committee of the Mayflower Board in 1947. The doubt was expressed by counsel for the special committee in a memorandum to the committee.

On September 26, 1951, we *sua sponte* ordered a rehearing as to (1) our holding that the provision of the management contract for payment of 10% of gross operating profits in excess of $1,000,000 was invalid, and the consequent holding that this provision should be deleted, and (2) our order respecting costs. These questions have been orally reargued. Since we now dispose of them on the basis of our order directing the rehearing, that part of the motion of appellants directed to these two questions is denied.

Appellees Hilton and Mayflower stress in reargument the testimony regarding the fairness in general of the compensation provisions of the management contract. They compare these provisions with other management contracts of large hotel properties. They point to the limitation which prevents payment in any event of more than $100,000 per annum by Mayflower to Hilton. They call attention to a special reference to the 10% provision in testimony supporting the contract. They submit calculations favorably comparing the results of operations of the contract, in terms of compensation, with other comparable contracts. They accordingly contend that the burden of demonstrating the entire fairness of the compensation provisions, including this particular provision, was sustained. They point to the absence of any testimony by appellants as to the unfairness of the provision. From this circumstance they contend that we cannot say the findings of the district judge were clearly erroneous. This contention would be sound if the ordinary rule as to the burden of proof were here applicable. As fully discussed in our original opinion, when the fiduciary relationship was shown, the burden fell upon the appellees to demonstrate the entire fairness of the contract, failing in which the findings sustaining the contract would be clearly erroneous. It was upon this basis that our original opinion rested.

There can be no doubt that the testimony regarding the 10% provision, outlined above, carries weight; and a majority of the court are now of the view that the burden upon appellees was met. This requires a modification of our previous decision and judgment. The effect is that the provision in the management contract with respect to the payment of 10% of gross operating profits in excess of $1,000,000, in

addition to 1% of gross sales, is not required to be deleted.

As to that part of the motion of appellants designed to require an accounting, the result of the foregoing, assuming as we do (because of advices to that effect lodged with the court) that Hilton elects to continue under the management contract, is that an accounting is required only as to the provision in the contract that all room, food, and like expenses of Hilton employees while in Washington attending to the affairs of Mayflower shall be paid by the latter.

With respect to costs, we adhere to the decision previously made.